**ESTATE OF Stephen L. BALDWIN.**

Supreme Judicial Court of Maine.

Argued Jan. 6, 1982.

Decided March 1, 1982.

Goranites & Libby, Peter J. Goranites, guardian ad litem (orally), Portland, for appellant.

Collins, Crandall & Hanscom, P. A., Stephen W. Hanscom (orally), Rockland, for Connecticut Nat. Bank.

Before McKUSICK, C. J., and GODFREY, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.

McKUSICK, Chief Justice.

This probate proceeding centers on the Port Clyde General Store, the principal asset of the estate of the late Stephen L. Baldwin. The guardian of the decedent's minor children, displeased with the executor's handling of that asset, brought a petition in the Knox County Probate Court asking, among other things, that the executor, The Connecticut National Bank, be sur-

charged as appropriate. The probate judge found that the Bank as executor had met its fiduciary obligations under Maine law, and the children's representative brings this appeal. The probate judge's finding was clearly erroneous; we therefore reverse and remand the case to the Probate Court for determination of the appropriate surcharge to be levied against the executor.

## I.

On May 30, 1979, Stephen L. Baldwin, a Maine domiciliary, died in a Downeast Airlines plane crash, leaving a widow, Tracy C. Baldwin, and three minor children by a former marriage. The children, aged 13 and younger, lived in Westport, Connecticut, with their mother, now Mrs. McKane. In his will the decedent divided his estate into two equal shares, one share to go to the widow and the other, to his three children.[1]

After his 1976 divorce from his former wife, Stephen Baldwin, then a Connecticut resident, had remarried; and in late 1978 he and his second wife Tracy moved to Port Clyde, Maine, where he had bought all the assets and operating business of the Port Clyde General Store. At the hearing in this proceeding, the general store was described as a "mom and pop" operation. The Bald-

wins lived in an apartment over the store. The property included a wharf and also a small lunchroom operated during the summer. Its gross revenues, warranted by its prior owners to be about $260,000 per year, were heavily dependent upon the seasonal tourist business on outlying islands, including Monhegan, and on the mainland in the vicinity of Port Clyde village. At the time of Baldwin's death on May 30, 1979, less than eight months after his purchase of the Port Clyde properties, he held title to all of the real estate, and the store business was operated by Stephen L. Baldwin, Inc., of which he owned 90% of the stock and his wife Tracy, 10%.[2] After Baldwin's death his widow continued to live in the upstairs apartment and operated the general store by herself.

In his will, made in 1977 when he lived in Connecticut, Baldwin nominated as executor The Connecticut National Bank, located in Bridgeport, Connecticut. After Stephen Baldwin's death, the Bank at first filed a declination of the appointment, but later withdrew it at the urging—as the Bank's trust officer, Mr. Bedworth, later testified—of Baldwin's family in Connecticut who "had been customers of ours for many

---

1. Decedent devised a one-half interest in his estate to his three minor children in equal shares per stirpes, subject to the further provision that the share of each child be held in trust until he or she reaches the age of 21. Decedent designated The Connecticut National Bank as trustee.

2. The probate inventory, filed on September 8, 1980, set the total value of the estate assets in Maine at about $166,000 on the date of the decedent's death. Of that total, the following values related to the Port Clyde General Store:

| | |
|---|---|
| Real estate | $ 81,200.00 |
| 90% of stock in Stephen L. Baldwin, Inc. | $ 0 |
| Personal loans by the decedent to Stephen L. Baldwin, Inc. | $ 38,779.05 |

The remainder of the estate assets in Maine consisted of a lobster boat and sundry other personal property, and a bank account, all inventoried at a value aggregating about $46,000. In addition, decedent owned a lot of land on Martha's Vineyard in Massachusetts, which the Bank's trust officer later testified was worth only about $5,000 because a search for drinking water on the lot had proven unsuccessful.

The decedent bought the entire assets of the store on October 5, 1978, for approximately $145,000. As described by Mr. John Pervear, an appraiser hired by the Bank in the late fall of 1980 to appraise the Port Clyde real estate separately from the appraisal done earlier for the probate inventory, the store occupied a parcel of land of about 5500 square feet, located directly on the harbor at Port Clyde. The structures on the property were a two-and-a-half story frame building, occupied by the store and a second floor apartment; a two-story warehouse; a small frame lunchroom; and a wharf. The buildings were constructed in the mid- to late-1800s and according to Mr. Pervear were in need of repair.

At oral argument, counsel informed the court that a tort recovery is expected, arising out of decedent's death in an air crash. Any such recovery would not be part of the estate, but would be distributed to the widow and children in accordance with the provisions of 18 M.R.S.A. §§ 2551–2553 (1965 & Supp.1980), now replaced by 18-A M.R.S.A. § 2–804 (1981 & Supp.1981).

years." The Bank was appointed executor by the Knox County Probate Court on October 26, 1979. In the course of the following year, the children's mother and other representatives [3] became concerned that the widow was not running the store well and repeatedly urged the Bank to supervise the store and to obtain from the widow sufficient information to evaluate the store's performance. The Bank resisted those importunities, maintaining "a neutral posture" for fear its action "could be interpreted as intimidation" by the widow. No one at the Bank ever inspected the store or audited its operation. No one at the Bank ever had any meaningful discussion with the widow about her business experience or her management of the store. The Bank never received, or ever requested, periodic financial reports from the widow. Sometime after March, 1980, the Bank did receive a copy of the federal income tax return filed by the corporation for its initial period ended April 30, 1979, that is, prior to Baldwin's death,[4] and also by late summer 1980 the Bank got an appraisal of the real estate for the purpose of filing the probate inventory. *See* n. 2 above. By early summer 1980 the Bank knew—its trust officer later testified—that the store was "not doing well."

On October 1, 1980, the children's guardian initiated the present proceeding by filing in the Probate Court a petition asking that the necessary persons be compelled to give account of the operations of the Port Clyde General Store; that the Bank be surcharged if it were found not to have met its fiduciary obligations; and that the Bank, if necessary, be ordered to take over the store. Two weeks after the children's petition was filed, the Bank sent the widow a letter asking her for the first time to account for her operation of the store. On October 17 the Bank petitioned the Probate Court for a license to sell real estate, representing that the estate's liquid assets were insufficient to meet its obligations.[5] After a preliminary hearing on the pending petitions, the Probate Court appointed a guardian ad litem for the children and ordered that the widow turn over to the other parties all financial records relating to the Port Clyde General Store and Stephen L. Baldwin, Inc. A quantity of such material was later produced and was examined by a business consultant retained by the guardian ad litem.

On January 22, 1981, the Probate Court held a joint hearing on the pending petitions. Mr. Robert Bedworth, a trust officer of the Bank with more than thirty years of experience in the business, testified as the Bank's representative in charge of the Baldwin estate. The parties later filed briefs, and the Bank filed financial statements for the store for periods through February 28, 1981, showing its operation continuously at a loss.

On April 6, 1981, the Probate Court entered its decree, making extensive findings of fact and concluding that the Bank had committed no breach of fiduciary duty. The Probate Court also granted the Bank's petition for a license to sell real estate, a matter that on appeal is not contested by the children's representatives. We are informed by counsel that the Probate Court on June 29, 1981, authorized the Bank to loan the estate sufficient funds to redeem the store property from a second mortgage then in foreclosure and to pay delinquent taxes. We are also informed by counsel

---

3. The minor children's mother, Mrs. McKane, was appointed their guardian by a Connecticut court in September of 1979. Mrs. McKane's attorney in Maine was appointed guardian ad litem for the Baldwin children by the Knox County Probate Court on October 21, 1980.

4. The corporation's income tax return for the year ended April 30, 1980, was not prepared until mid-October, 1980, and therefore was not available to the Bank until after this proceeding had commenced. All tax returns showed operating losses.

5. At the January 22, 1981, hearing Mr. Bedworth for the Bank testified that the debts and expenses of administration of the estate. amounted to about $56,712, exclusive of counsel fees for attorneys for the beneficiaries. By the time of the hearing the Bank had accumulated an aggregate of liquid assets of only about $29,000 for payment of those debts and expenses. The probate judge found the estate to be insolvent.

that on October 31, 1981, the Bank sold all the real estate and improvements of the Port Clyde General Store for $100,500, and on the same day Stephen L. Baldwin, Inc. sold all of its assets to the same purchaser for about $29,000.

## II.

■■■ Under the case law and the statute applicable to the administration of this estate prior to January 1, 1981, the effective date of the Probate Code, the fiduciary obligations of an executor[6] are defined in very general terms. Under the prior statute, 18 M.R.S.A. § 4054 (1965), the executor must "exercise the judgment and care under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs."[7] The executor is required to use good faith and prudence consistent with his duty. *Hanscom v. Marston*, 82 Me. 288, 297, 19 A. 460, 462 (1890). But good faith and prudence are not alone enough; the executor must take care to enlighten his judgment. *Mattocks v. Moulton*, 84 Me. 545, 551, 24 A. 1004, 1006 (1892). The executor must preserve from depletion the total fund in which all of the beneficiaries will share. *In re Estate of Morine*, Me., 363 A.2d 700, 704 (1976). The executor must be impartial among beneficiaries. *Id.* An executor representing that he has more skill than an ordinary person is under a duty to use that skill.[8] *See Restatement (Second) of Trusts* § 174 (1959). The executor is under a general duty not to delegate

to others the responsibilities of administering and distributing the estate. *See id.*, § 171. Even before the Probate Code, 18–A M.R.S.A. § 3–703(a) (1981), explicitly declared that

> [a] personal representative is under a duty to settle and distribute the estate of the decedent ... as expeditiously and efficiently as is consistent with the best interests of the estate[,][9]

the law imposed on executors a comparable duty of diligence. *See Mattocks v. Moulton, supra* 84 Me. at 551–52, 24 A. at 1006 (duty of diligence); *Matter of Larson*, 87 Misc.2d 397, 402, 385 N.Y.S.2d 720, 724 (Surr.Ct.1976) (duty to liquidate estate assets "as soon as practicable"). Expeditious settlement of decedents' estates was implicit in the statutory provisions requiring the executor to file an inventory within three months of his appointment, 18 M.R.S.A. §§ 1501(1), 1801 (1965), and a just and true account of his administration within a year, *id.*, § 1501(3).

## III.

Upon its appointment as executor of the Baldwin estate on October 26, 1979, the Bank was immediately faced with a situation crying out for its speedy attention. The principal asset of the estate was the Port Clyde General Store, an operating business conducted by a corporation over which the Bank through its 90% stock ownership could by general corporate law wield complete control.[10] More specifically, the

---

**6.** Under the Probate Code, executors and other persons acting in a fiduciary capacity with respect to decedents' estates are called "personal representatives." 18–A M.R.S.A. § 1–201(30) (1981).

**7.** Under the Probate Code, the standard has been changed to that of "a prudent person dealing with the property of another." 18–A M.R.S.A. § 7–302(a) (1981), made applicable to personal representatives by *id.* § 3–703(a).

**8.** This rule has now been codified in 18–A M.R. S.A. § 7–302(a) (1981).

**9.** *See also* 18–A M.R.S.A. § 3–704 (1981), providing:

> A personal representative shall proceed expeditiously with the settlement and distribution of a decedent's estate. . . .

**10.** The Bank as 90% shareholder of Stephen L. Baldwin, Inc., had the duty to exercise its power over that corporation for the benefit of the estate. *In re Hubbell's Will*, 302 N.Y. 246, 97 N.E.2d 888, 891 (1951); *Matter of Auditore*, 249 N.Y. 335, 341, 164 N.E. 242, 243 (1928); Cahn, *Estate Corporations*, 86 U.Pa.L.Rev. 136, 137–38 (1937). Even though the requirement of 18 M.R.S.A. § 1403 (1965) that the executor get court authorization before it carried on the decedent's business may not apply to an incorporated business, even though wholly or predominantly owned by the decedent, J. Ritchie, N. Alford & R. Effland, *Decedents' Estates and Trusts* 1224–25 (5th ed. 1977), the executor's

bylaws of that corporation, Stephen L. Baldwin, Inc., expressly provided:

> The business and affairs of the corporation shall be managed by its shareholders.[11]

Presumably, that bylaw reflected an identical provision in the articles of incorporation, which thus brought into effect the following provision of the Business Corporation Act:

> If the articles of incorporation of a close corporation expressly so provide, the business of such close corporation shall be managed by the shareholders of the close corporation rather than by a board of directors; ....

13–A M.R.S.A. § 701(2) (1981). Thus, the Bank by accepting appointment as executor assumed the direct functions and responsibilities of management nominally performed by the corporation's board of directors.

For the five months since Stephen Baldwin died, his widow had been operating the store and occupying the second floor apartment in the store building. As equal beneficiaries under the Baldwin will, the second wife and the three minor children, under the custody and guardianship of Mrs. McKane, had by law become vested with title to the real estate as tenants in common.[12] Continued operation of the store business held a great risk of operating losses; but, at the same time, its operation in a satisfactory fashion for a limited period might help to maintain the resale value of the real estate and the store business as an operating unit. Since the second Mrs. Baldwin rather than the children would in the natural course of events desire to take the Port Clyde General Store in distribution of her half of the net estate, it might be seen by some, as later claimed by the children's representatives, that it was in her personal interest in the short run to operate the store in a way to depress the property's value for purposes of distribution. The potential for suspicion and animosity between the widow and the first wife who served as guardian of the children was obvious from the outset, and that potential quickly turned into reality when the Bank within a couple of months started to receive demands for information about the store from the children's representatives.

It also should have been clear to the Bank at an early date—at the latest on expiration of the six-month period for filing claims against the estate[13]—that funds would have to be raised from the Port Clyde properties in order to pay debts and expenses of administration.[14] Those necessary funds might be raised by a sale to a third person, which was in fact what ultimately happened, or by a distribution in part and a sale in part to the widow. The Bank had a duty to take into account the wishes of the widow who enjoyed the lifestyle she and her deceased husband acquired with the purchase of the Port Clyde General Store; at the same time, it had to administer and distribute the estate with impartiality.

## IV.

With the 20–20 vision of hindsight, we can now see what optimally an executor of

---

11. Mr. Bedworth testified that the Bank had never obtained a copy of the bylaws of the corporation.

responsibilities in regard to the controlled corporation's continuing business are exactly the same as in regard to the unincorporated business. The Business Corporation Act gives a 90% shareholder complete authority to liquidate the corporation and terminate its business, 13–A M.R.S.A. § 1103 (1981), or to change its management or manner of doing business, *see id.* §§ 202, 401, 701, 714, powers that duplicate those of the executor owning an unincorporated business. The executor must exercise the identical standard of care over the continuing operation of the decedent's business, whether or not incorporated.

12. *See Desmond v. Persina*, Me., 381 A.2d 633, 637 (1978).

13. 18 M.R.S.A. § 2402 (Supp.1980).

14. At the hearing Mr. Bedworth conceded that, within two or three months of the Bank's appointment in October, 1979, he knew the estate had "a cash problem." Yet the Bank did not file its petition for license to sell the Port Clyde real estate until October 17, 1980, following the children's petition commencing the proceeding now here on appeal.

the Baldwin estate should have exercised himself to do promptly upon his appointment. The executor should at once have informed himself of the nature of the Port Clyde properties and the quality of the store management by the widow, by an on-site inspection in person, aided by a knowledgeable appraiser and a competent accountant. Recognizing that an executor cannot countenance continuation of a losing business [15]—except as it might be briefly justified to maintain the sale value of the real estate or of the going concern[16]—the executor should have promptly determined the profit-and-loss prospects of the store. If the widow's bookkeeping methods were inadequate to permit meaningful financial reporting on a frequent periodic basis, and she was to be left in control and management of the store, the executor should have seen that she had help in setting up at least a minimally adequate system for that purpose. Simultaneously, the executor should have determined as quickly as possible the debts and probable expenses of administration and the taxes, if any, in order to know whether liquid or liquifiable assets of the estate were adequate to discharge those obligations so that sale of the Port Clyde real estate would not be required. Through such investigation, the executor would have immediately found that the store was operating at a loss and also that at least part of the Port Clyde properties would have to be sold to pay the estate's debts and expenses. Armed with those findings, the executor would have been compelled to proceed promptly to a decision on how to distribute or sell the Port Clyde business and real estate. That decision was his alone to make and he was duty-bound to make it with diligence. *See Kaufman v. Kaufman's Adm'r*, 292 Ky. 351, 166 S.W.2d 860 (1942). He could and should have given the widow an opportunity to take the Port Clyde General Store as her distributive share upon her making an appropriate compensating payment to the estate; but the executor's negotiations with her to that end should not have been permitted to delay an early offer of the properties for sale to others.

## V.

No executor, any more than any other human being or human institution, can be expected to be endowed with foresight that is always equal to hindsight.[17] Nor is it true that a single judgment call will always be the one and only judgment call that will satisfy the standard of prudence imposed upon executors. Nonetheless, even allowing for the limitations on human foresight and even giving a reasonable range for the prudent exercise of judgment, this court sees from a recitation of "what might have been" in the administration of Stephen Baldwin's estate at least two legally critical shortcomings in the Bank's performance as executor of the Port Clyde properties during the period between October 26, 1979,[18] and October 17, 1980.[19]

First, the Bank, at no time during that year and least of all within the limited time required for expeditious settlement of the estate, did anything to investigate adequately the nature, value, existing management, and profit-and-loss circumstances of the store.

Second, during that year the Bank exercised no judgment, informed or otherwise,

15. *See In re Estate of Kurkowski*, 487 Pa. 295, 302, 409 A.2d 357, 361 (1979); *Bowen v. Lewis*, 198 Kan. 706, 712, 426 P.2d 244, 250 (1967); *In re Hubbell's Will, supra*, 97 N.E.2d at 892.

16. *See Matter of Ridosh*, 5 A.D.2d 67, 169 N.Y. S.2d 54 (1957); *Poindexter v. First National Bank of Winston-Salem*, 244 N.C. 191, 92 S.E.2d 773, 775–76 (1956); *In re Newcomer Estate*, 70 York 162, 170, 9 Pa.D.&C.2d 99, 116–17 (Pa.Orph.1956).

17. *Restatement (Second) of Trusts* § 174, Comment b, states:

> Whether the trustee is prudent in the doing of an act depends upon the circumstances as they reasonably appear to him at the time when he does the act and not at some subsequent time when his conduct is called in question.

18. The date of the Bank's appointment as executor.

19. The date the Bank filed with the Probate Court a petition for sale of the Port Clyde real estate.

on the disposition of the Port Clyde General Store, whether by sale or distribution or a mixture, and took no action whatever to resolve that issue. Rather, as to the Port Clyde General Store, it abdicated its affirmative obligation to settle and distribute the estate expeditiously. It passively stood by in a hope that the warring beneficiaries would come to an agreement for the disposition of the major asset of the estate.

By way of confession and avoidance, the Bank puts forth a variety of defenses, none of which we find excuse its fiduciary lapses. First, the Bank complains that it initially declined the nomination as executor and agreed to withdraw its declination only at the urging of relatives of the decedent who had long been its customers. The reasons for the Bank's accepting the Probate Court's appointment as executor are entirely irrelevant. The Probate Court, not certain unidentified Baldwin family members, appointed the Bank as executor. Regardless who persuaded the Bank to change its corporate mind, its appointment imposed the same responsibilities upon it as are imposed upon any executor.

As a second justification for its inaction, the Bank on appeal asserts that the impartiality mandated of an executor by such cases as *In re Estate of Morine, supra,* prevented the Bank from taking any initiative in resolving the issue of the disposition of the Port Clyde General Store. Mr. Bedworth testified that exceptionally acute differences and animosities among the beneficiaries made him fearful that affirmative action on the Bank's part would give offense and involve the Bank as a disputant. The Bank's error was fundamental. The responsibility for expeditious settlement and distribution of the Baldwin estate rested exclusively upon the Bank, and not to any degree upon Mrs. Baldwin or her stepchildren or their respective lawyers or other representatives.[20] *See Restatement (Second) of Trusts* § 171. While a negotiated agreement among the beneficiaries would of course have eased the Bank's task, the record contains no evidence that the Bank took any serious action to mediate between the combatants. The inherent conflicts between the beneficiaries, which should have been apparent to the Bank from the start and which soon broke out into open conflict, would to a prudent executor have been clear warning signals that this estate required particularly aggressive attention and that the Bank would rely at its peril on the parties' reaching a negotiated settlement to take the place of what it was appointed to decide and do. We do not condone unwarranted contentiousness on the part of the beneficiaries and their attorneys and other representatives, but the unpleasantness of the fray was no justification for the executor to retreat from responsibilities that belonged solely to it. On the contrary, the executor should have known that it had to exert more effort and diligence than ever to make up for the absence of a happy family, united in agreement on the handling of the estate.

As a third justification, the Bank's trust officer at trial urged that the Bank necessarily relied upon the widow's management of the store because the Bank lacked expertise to run the store itself, the estate could not afford to hire an outside manager, and the Bank knew no one in Maine to examine and report on the store's functioning. Ordinary prudence did not necessarily demand that the Bank take over direction of the store to the exclusion of the widow; indeed, prudence might suggest no disruption in the existing management arrangement, at least if investigation showed it going satisfactorily. Rather, the Bank's default lay in its making no meaningful investigation at all.[21]

20. We are not at all concerned here with the question of how far a corporate trustee may go in acting through human agencies other than its own directors, officers, and employees. *See* 2 *Scott on Trusts* § 171.4 (3d ed. 1967). The Bank's breach of fiduciary duty consisted of failing to act at all in making a proper investigation or exercising the needed judgment. *Cf.*

*Estate of Talbot,* 141 Cal.App.2d 309, 296 P.2d 848 (1956) (trustee surcharged for not exercising independent judgment in selling stock and buying bonds at request of one beneficiary).

21. *Restatement (Second) of Trusts* § 174, Comment c (1959) states that a trustee "does not use proper care unless he acquaints himself . . .

It deliberately "flew blind." The position taken by Mr. Bedworth strongly suggests that the Bank was ill-suited to administer the principal asset of the Baldwin estate, located as it was far distant from the Bank's headquarters and involving as it did a "mom and pop" operating business without any established method of reporting to shareholders. Obviously, the inappropriateness of appointing the Bank as executor of such property does not excuse the Bank for its failure to carry out the trust it nonetheless accepted. The Bank plainly failed to demonstrate the skills that the law expects of the professional fiduciary it holds itself out to be. *See Restatement (Second) of Trusts* § 174. The fact that the Baldwin estate did not consist of a neat portfolio of listed securities provides no excuse for the Bank's abdication of its responsibilities.

In sum, the Bank's after-the-fact justifications reveal an unduly relaxed conception of its duty as executor of an estate whose principal asset consists of a small, closely held business. We conclude that the Bank did not live up to its fiduciary obligations and that the children's prayer for a surcharge against the Bank should have been granted. On this record the Probate Court's finding to the contrary was clearly erroneous.

### VI.

To determine the appropriate amount of surcharge, we must remand this proceeding to the Probate Court. That determination shall be made on the existing record amplified by such further evidence as the parties and the court may find necessary in light of this opinion. On the surcharge issue the Bank, on the one hand, and the beneficiaries, on the other, will be adversaries. *See Restatement (Second) of Trusts* § 199(c).

We find nothing in this record to require the Probate Court to replace the Bank with another fiduciary who could represent the estate in asserting the surcharge claim against the Bank.[22] *See id.,* Comment e; 18–A M.R.S.A. § 3–614(2) (appointment of special administrator "where a general personal representative cannot or should not act"). The Port Clyde General Store, to which alone the Bank's dereliction relates, has already been sold and all the beneficiaries are represented by counsel who will fully represent the estate's interest adverse to the Bank. At the same time, the Bank is in the best position to complete economically the administration of the Baldwin estate, of which the unfinished aspects are apparently of a routine nature.

The deficiencies in the Bank's handling of the Port Clyde General Store resulted in delay of its sale, which was ultimately accomplished on October 31, 1981. The Probate Court needs to estimate the length of that delay caused by the Bank's shortcomings; fixing the amount of an appropriate surcharge will, at a minimum,[23] involve determination of any operating losses of Stephen L. Baldwin, Inc., as well as any shrinkage in the value of the real estate, that occurred during that period of delay. *See Restatement (Second) of Trusts* § 205 (measure of liability for breach of trust); *see also* 3 *Scott on Trusts* § 209 (3d ed. 1967). The trial court may find the present circumstances appropriate for its direct appointment of one or more expert witnesses pursuant to M.R.Evid. 706. The court will get maximum benefit from expert witnesses who testify to their opinion on the direct question of any loss in operations or property values during the period of unreasonable delay in selling the store. *Cf. Van Horn v. Hillcrest Foods, Inc.,* Me., 392 A.2d 52 (1978)

with the nature and circumstances of the trust property."

**22.** We do not mean to tie the hands of the Probate Court if it concludes on remand that the Bank should be removed as executor. We simply emphasize that, in whatever is done, concern must be had for avoiding any unnecessary additions to the expense of administering this relatively modest estate.

**23.** We express no opinion on what compensation should be allowed the Bank, 3 *Scott on Trusts* § 243 at 2138–44 (3d ed. 1967), or on whether the operating and property losses suffered because of the delay in selling the store constitute the limit of the appropriate surcharge against the Bank, 3 *Scott on Trusts* § 205.

(workers' compensation case directing comparative medical testimony on petition for review of incapacity).

 We also hold clearly erroneous the Probate Court's finding that the date-of-death values for the Port Clyde General Store that the Bank used in the probate inventory filed on September 8, 1980, were reasonable. The children's guardian ad litem argues that those inventory values are too low and that they therefore understate the extent to which the property lost value as a result of the Bank's breach of fiduciary duty. The probate judge appears to have based his acceptance of the date-of-death values at least in part on the following finding:

> The Warrant and Inventory was presented by the Executor in September 1980 and contained date of death valuations. Form 3 of the Inheritance Division of the Maine Bureau of Taxation as well as I.R.S. Form 706 were filed and contained the same data and were accepted by the parties.

There is no evidence in the record that either the inventory or the tax return values were ever accepted by the children's guardian ad litem. In August, 1980, the Bank's local counsel sent the guardian ad litem a proposed inventory, to which the guardian made vigorous objection. The Bank filed the inventory anyway on September 8, 1980, but there is no evidence that any notice of the filing ever went to the guardian ad litem. Indeed, at the hearing on January 22, 1981, the guardian apparently still did not realize that an inventory had been filed, but was objecting to the inventory as proposed. Under these circumstances, any finding by the probate judge that the inventory values were "accepted" in any affirmative sense was clearly erroneous, and we vacate that finding. In any event, we would be unwilling to elevate the consequences of a procedural default to the level of proof of the date-of-death values that then could be used as a starting point for determining the amount of surcharge, if any, to be assessed against the Bank. On remand, the Probate Court will determine what, if any, loss was in fact suffered by the estate by reason of the Bank's lack of proper attention to its fiduciary obligations. That determination must be made free of any estoppel or other consequences of the values used in the probate inventory and the federal and state tax forms.

The entry is:

Judgment of Knox County Probate Court reversed.

Case remanded for further proceedings consistent with the opinion herein.

All costs on appeal taxed against The Connecticut National Bank in its individual capacity.

All concurring.