**ESTATE OF Leo P. TESSIER.**

Supreme Judicial Court of Maine.

Argued Sept. 15, 1983.

Decided Nov. 14, 1983.

Ronald J. Cullenberg, Farmington (orally), for plaintiff.

Richard Edwards (orally), Perkins & Edwards, Guilford, for defendant.

Before NICHOLS, ROBERTS, VIOLETTE and GLASSMAN, JJ., and DUFRESNE, A.R.J.

DUFRESNE, Active Retired Justice.

Leo P. Tessier died on September 17, 1979, leaving a will in which he nominated the Northeast Bank of Guilford executor for the administration of his estate. Tessier's children [1] raised objections to the first and final account filed by the Bank with the Probate Court, Somerset County, on March 10, 1981. In pursuit of their objections to the Bank's accounting, the children, on July 14, 1982, filed two petitions with the Probate Court, one for *review* of the Bank's employment of, and compensation paid to, its attorneys, as well as for review of the reasonableness of its own compensation for its own services as personal representative of the estate (18–A M.R.S.A. § 3–721), the other petition seeking to have the Bank surcharged for breach of various duties allegedly mandated by its fiduciary position (18–A M.R.S.A. § 3–712).[2] On

---

[1] Lorene Pratt, Ramona Tessier, Cora Eighney, Ronald Tessier, Virginia Richards and Paul Tessier are the children of Leo P. Tessier and the residuary beneficiaries of his will. Throughout these proceedings the six children have been represented as a unit by the same counsel and for purposes of simplicity we will refer to them collectively as the "children."

[2] 18–A M.R.S.A. § 3–712 provides in relevant part as follows:

If the exercise of power concerning the estate is improper, the personal representative is liable to interested persons for damage or loss resulting from breach of his fiduciary duty to the same extent as a trustee of an express trust . . . . .

January 12, 1983, the Probate Court after hearing allowed the executor's account as a first account, and denied the children's petitions. They appeal from that decision, and we affirm.

Surcharge of the Bank is claimed on account of breaches of duties in several particulars and because of alleged excessive fees paid to its attorneys and excessive compensation taken by itself as executor. These alleged breaches of duties range from the failure to renegotiate the testator's inter vivos option to sell the ancestral home to one Pensiero to the non-renting of the home for a year, to the loss of income in not investing funds of the estate in money market certificates, to the omission to inventory certain Florida personal property. We shall dispose of each contention in sequence.

1. *Renegotiation of the inter vivos option.* In October, 1971, the deceased, Leo Tessier, sold a small grocery store in Rockwood to Joseph Pensiero. The purchase-sale agreement included an option whereby Pensiero, upon Tessier's death, could purchase for $19,000 the Tessier residence *and accompanying real estate* next to the grocery store. After Tessier's death and shortly after the Bank's appointment as executor, the children informed the Bank that the value of the house and land far exceeded $19,000 and that they objected to the Bank's selling it to Pensiero at the option price. On October 25, 1979 Pensiero filed in Probate Court a 'proof of claim' against the estate based upon his option to purchase the residence.

The Bank sought the advice of its own corporation counsel and of the attorney for the estate, each of whom advised that Pensiero held a valid option. The dispute between the children and Pensiero centered on whether there was any consideration for the option. The Bank, through its legal advisers, determined that Pensiero had earlier refused to buy the grocery store without the adjacent real estate, and that the option became necessary for the sale and purchase of the store to take place. The Bank also inquired as to the value of the residence by examining a financial inventory prepared by Leo Tessier himself in 1979 and by obtaining two additional appraisals of its market value.

The Bank, however, disregarded the children's objections; instead, it encouraged Pensiero to sue for specific performance of the option. Pensiero did file such an action in Superior Court. Prior to any judicial resolution of the issue, the children bought the option from Pensiero for $8,000, and, then, one of them purchased the house for $35,000; this resulted in a gain of $8,000 to the estate.

2. *Non-renting of the home.* In April, 1980, Kay Staples, Tessier's housekeeper, moved out of the Tessier residence. On the Bank's request of the children for them to agree to the Bank's renting of the building while it sought a buyer, they readily consented; nevertheless, the Bank never did attempt to rent the place. From the evidence before the court, it appears that the rental value of the house from April, 1980, to April, 1981, when the property was sold, was $3,000.

3. *Loss of Income.* Leo Tessier had approximately $63,000 invested in United States treasury notes and in several savings accounts. These accounts and notes earned interest at rates from 5.75% to 7.9%. During the period in question, six-months money market certificates earned interest at approximately 11%. Most of the $63,000 was invested in banks other than the Northeast Bank of Guilford. Approximately one half of the $63,000 was distributed to the children during the first year of administration in April, June and July of 1980. Funds placed in a money market certificate could not be withdrawn during the six months period without a substantial penalty.

4. *The Florida personal property.* Tessier owned a mobile home in Florida which, together with its contents, had been evaluated by him at $5,000 in 1979. The Bank did not prepare a list of the personal property located in the trailer for inventory purposes. The Bank received an appraisal from the trailer park owner who valued the trailer and its contents at $4,500. Kay Sta-

ples, the former housekeeper, prepared a list of the personal property in the trailer for the children, and Virginia Richards, one of them, evaluated the same at $2,540. The Bank sold the trailer and all of its contents for $5,500.

5. *Fees.* In its first and final account the Bank sought fees of $10,782.08 of which $6,009.89 was for attorney's fees. The Bank's fee of $4,772.19 was based upon a commission arrangement it had made with Leo Tessier in his lifetime. This figure primarily represents a commission of 5% of the value of the estate. The attorney in question had spent 15 to 20% of his ten-year practice in probating estates. He testified that his charges were $100 per hour for court time work and $60 per hour for office time work. He considered the case, so he stated on the stand, a particularly difficult one. In their petition for review of compensation the children contend that these fees were excessive.

### Standard of review

■ On appeal, we can reverse the judgment of the Probate Court only if its findings of fact are clearly erroneous. *Estate of Rosen,* 447 A.2d 1220, 1221 (Me.1982). *See also Estate of Turf,* 435 A.2d 1087, 1089 (Me.1981); *Estate of Hatt,* 431 A.2d 52, 53 (Me.1981). Although we might not have found the Bank completely blameless, had we been the authorized fact-finding forum, we cannot say on this record that the Probate Court's judgment for the Bank was clearly erroneous.

At the time of the Bank's appointment as executor of the estate of Mr. Tessier, the Probate Code had just been enacted by the Legislature, but by express provision of the legislative act it did not become effective until January 1, 1981. Public Laws, 1979, ch. 540, § 53 (18–A M.R.S.A. § 8–401(a)). We must presume that the Bank, as a professional fiduciary operating a trust department, was familiar with the Code's mandated standard of conduct in dealing with trust property.

Except as otherwise provided by the terms of the trust, the trustee shall observe the standards in dealing with the trust assets that would be observed by a prudent person dealing with the property of another, and if the trustee has special skills or expertise, he is under a duty to use those skills.

18–A M.R.S.A. § 7–302(a). This standard of care is made applicable to personal representatives, which include executors and administrators. 18–A M.R.S.A. § 3–703(a). This statute further prescribes that

[a] personal representative is under a duty to settle and distribute the estate of the decedent in accordance with the terms of any probated and effective will and this Code, and as expeditiously and efficiently as is consistent with the best interests of the estate. He shall use the authority conferred upon him by this Code, the terms of the will, if any, and any order in proceedings to which he is a party for the best interests of successors to the estate.

The preexisting law, 18 M.R.S.A. § 4054, couched the fiduciary's standard of care in somewhat different terminology.

[A] fiduciary shall exercise the judgment and care under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital. Within the limitations of the foregoing standard, a fiduciary is authorized to acquire and retain every kind of property, ..., which men of prudence, discretion and intelligence acquire or retain for their own account, ....

The change in language is more cosmetic than substantial, as even under the old standard of care the fiduciary's treatment of the trust funds as if they were his own estate was not absolute. In *Mattocks v. Moulton,* 84 Me. 545, 552, 24 A. 1004 (1892), the Court said:

While he must be as diligent and painstaking in the management of the trust estate, as the average prudent man is in managing his own estate he may not always place the trust funds where he, or the average prudent man, would place his own funds. In measuring the duty of the trustee with the usual conduct of the man of average prudence in the care of his own estate, reference is to be had to the conduct of such a man in making permanent investments of his savings outside of ordinary business risks, rather than to his conduct in taking business chances.

The Code's formulation of the standard of care in terms of what prudent persons would use when dealing with the property of others was merely intended to debunk the idea that the standard of care of the reasonable person in dealing with his own property heretofore prevailing might be viewed as an entirely personal concept. The fiduciary's obligation always was to administer the trust property having in mind at all times the several interests of the beneficiaries of the estate and of others interested therein. *See Ahuna v. Dept. of Hawaiian Home Lands,* 64 Hawaii 327, 640 P.2d 1161, 1169 (Haw.1982); Uniform Laws Annotated, Master Ed., Vol. 8, p. 555 (Comment to Section 7–302 of the Probate Code). *See also In Re Cook's Trust Estate,* 20 Del.Ch. 123, 171 A. 730 (1934).

We need not detail the differences, if any, between the standard of care with which fiduciaries under the old law had to comply, *i.e.* exercise the judgment and care under the circumstances which men of prudence, discretion and intelligence exercise in the management of their own affairs, and the current formulated duty under the Probate Code, *i.e.* to observe the standards in dealing with the trust assets that would be observed by such persons when dealing with the property of another. Testing the Bank's conduct in the instant case under either standard, we cannot say that the judge of probate was clearly in error in his findings of fact and we do reach the same conclusion of law as he did, that surcharges were not warranted.

As pointed out in *Estate of Baldwin,* 442 A.2d 529, 532 (Me.1982), comparable duties of diligence were imposed upon fiduciaries by the code as by the old law. *Mattocks v. Moulton, supra,* 84 Me. at 551–52, 24 A. at 1006; 18–A M.R.S.A. § 3–703(a). In all cases, the executor must act in good faith, but good faith and prudence are not alone enough. As stated in *Estate of Baldwin,* the duties of an executor (and these survive implicitly in the code if not expressly codified therein) encompass the obligation to fully enlighten oneself without delay by investigation or otherwise as to what needs to be done in the discharge of the office consistent with the duties required by a proper management of the trust estate. The executor must always bear in mind that the estate must be preserved for distribution to the beneficiaries, and investments are to be made or maintained in such a way that will not interfere with an expeditious settlement of the estate. No matter what dissension or displeasure may arise among the beneficiaries of the estate, their attorneys or other representatives, the executor must realize at all times that it is his affirmative duty to manage the deceased's property in such a way as to fulfill his obligation which is his alone to settle and distribute the estate as expeditiously and efficiently as is consistent with the best interests of the estate. 18–A M.R.S.A. § 3–703(a). *See also Estate of Baldwin, supra,* at 534–35.

### 1. *The Pensiero Option*

In reviewing the Bank's handling of the children's objections to the honoring of Tessier's option agreement with Pensiero, we do not require that its conduct conform to what we know in hindsight might have been the best course to follow. *Estate of Baldwin,* 442 A.2d at 534. We look at what the Bank knew and at what a skilled professional should have known in evaluating its choices of action and the propriety of its determination therein.

■ The children argue that the Bank should have renegotiated the option price with Pensiero. But, if the option was a legally valid part of the existing contract between the deceased and Pensiero, that left the Bank with no leverage with which to renegotiate, the position taken by Pensiero's attorney with the Bank. We believe that the Bank was justified in relying on the opinion of counsel that adequate consideration supported the purchase option and in favoring, as it did, a judicial determination of the question.

■ We cannot say that the children's ability to buy the option for $8,000 and sell the house to one of them for $35,000 proves that the Bank did not prudently manage the estate. It would have been risky for the Bank to use the estate's funds to buy the option and then attempt to sell the house. This would have tied up even more of the estate's assets at a time when the children were demanding that those funds be invested or distributed. Although some persons, such as the children here, may have been willing to risk their own money to buy up the option, it was within the range of reasonableness and prudence for the Bank in its professional judgment to take a more cautious course.

### 2. Non-renting of the home

■ The decision of the Bank not to rent the house may be questionable, but the Probate Court's decision that the Bank's conduct in that regard did not constitute a breach of duty is not clear error. Again, the Bank cannot be held to the hindsight knowledge we now have, that the house would go unoccupied from April 1980 to April 1981. True, the dispute respecting the Pensiero option should have suggested a delay in the availability of the house for sale either to Pensiero or some third party; nevertheless, pursuant to its duty to expeditiously settle and distribute the estate under 18–A M.R.S.A. § 3–704, the Bank could take into consideration that the matter might be resolved within a short period of time and, if the Pensiero option were per-

chance declared invalid, that it needed to keep its position flexible so that a sale to a prospective purchaser might be more readily and advantageously made. Furthermore, no evidence was introduced showing the house-rental market in the area to support the children's contention that the house was readily rentable, even though on the market for sale. Under all these circumstances surrounding the dispute respecting the sale of the house, we cannot say that the court below committed clear error in refusing to surcharge the Bank for alleged loss of rent pending resolution of the question.

### 3. Money market certificates

■ The children contend that the Bank improperly failed to exercise the power that it had to seek greater revenue for the estate, that it should not have retained the estate's assets in bank savings accounts or United States treasury notes as Mr. Tessier had done, but that it had the duty to invest the funds in more profitable money market certificates. The loss resulting from this alleged breach of fiduciary duty, it is asserted, should have compelled a surcharge as requested. See 18–A M.R.S.A. § 3–712. We disagree. The children early on were pressuring the Bank to make partial distributions, and the Bank's refusal to commit funds of the estate on a long term basis, which money market certificates would have involved, merely reflects its concern for flexible estate management, which in fact permitted the Bank to make the partial distributions sought by the children. The Bank's good faith cannot be questioned on this score, as the moneys were invested primarily in other banks; there were no grounds for imputing an improper profit motivation to the Bank's investment choice.

### 4. The Florida personal property

■ The executor failed to inventory separately as assets of the estate the personal furnishings which Mr. Tessier owned at his death in his house trailer in Florida. A bank officer testified that "it was our job to attempt to get a figure for the trailer and

contents at least that would equal or exceed the figure that the owner had placed on it that very year that he died, which we did." This was a technical violation of the Code, as well as of the existing law prior thereto.[3] Even though under 18–A M.R.S.A. § 3–611(b), a personal representative's failure to perform any duty pertaining to the office is made "cause for removal" when removal would be in the best interests of the estate, the Bank's failure in the instant case to include in the inventory of the estate's assets the decedent's household goods in his Florida trailer home may not be the cause for surcharge, where the breach of duty was formalistic only, the executor acted in good faith and the record shows that no loss ensued to the estate. Such omission was overlooked and characterized as a breach of only a directory regulation in *Pettingill v. Pettingill,* 60 Me. 411, 419 (1872). We conclude that no error was committed in this area.

### 5. *Executor's compensation and Attorneys' fee*

■ In 18–A M.R.S.A. § 8–401, it is provided that

(2) The Code applies to any proceedings in Court then [January 1, 1981] pending or thereafter commenced regardless of the time of death of decedent except to the extent that in the opinion of the court the former procedure should be made applicable in a particular case in the interest of justice . . . .

Thus, pursuant to 18–A M.R.S.A. § 3–719, the Bank, as personal representative, was entitled to reasonable compensation for its services. The 5% commission charged and received by the Bank stemmed from an agreement made by it with Mr. Tessier, the testator. The law expressly recognizes such inter vivos agreements, since the reference section does state that if a will provides for

compensation of the personal representative *and there is no contract with the decedent regarding compensation,* he may renounce the provision before qualifying and be entitled to reasonable compensation. We see nothing in this record to preclude the Bank's recovery of compensation according to the pre-arranged commission agreement.

■ So far as the attorneys' fees paid out are concerned, we cannot say that the Probate Court was clearly in error in approving such disbursements. The record is devoid of any expert evidence to support a claim of excessive charges by the attorneys for the legal services furnished the executor in connection with the dispute surrounding the Pensiero option and its defense of the children's petition for removal of the Bank as executor carried on appeal to the Superior Court acting as the Supreme Court of Probate. The Probate Court was justified in accepting the attorney's testimony that the total hours of work involved and the rates per hour charged were not outside the range which attorneys of his standing in comparable cases would say are reasonable. *See* 18–A M.R.S.A. § 3–720.

These legal charges were made necessary by reason of the ongoing disputes between the children and the Bank executor. Although a personal representative should not reject out of hand the suggestions of the beneficiaries, but in the exercise of a sound discretion might honor their wishes if consistent with the overriding duty which the law imposes upon an executor to provide a prudent, efficient, expeditious, impartial and professional administration of the estate, we find in this record no cause for surcharge on account of payment of excessive attorneys' fees. The Probate Court could consider as guides in determining their reasonableness:

---

**3.** 18–A M.R.S.A. § 3–706 provides in pertinent part as follows:

Within 3 months after his appointment, a personal representative, . . . shall prepare and file or furnish an inventory of property owned by the decedent at the time of his death, listing

it with reasonable detail, and indicating as to each listed item, its fair market value as of the date of the decedent's death, . . . . .

Its counterpart under the prior law may be seen at 18 M.R.S.A. § 1501(1).

the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the service properly;

the fee customarily charged in the locality for similar services;

the amount involved and the results obtained;

the time limitations imposed by the personal representative or by the circumstances;

the experience, reputation and ability of the person performing the services.

18–A M.R.S.A. § 3–721. The Probate Court's ultimate decision thereon consisted of findings of fact which we cannot reverse on appeal except for clear error.[4]

The entry is:

Judgment affirmed.

All concurring.

---

4. Because we affirm the Probate Court's judgment that the petitions below were unmeritorious, we need not reach the appellee-bank's alternative ground for affirmance, that the earlier proceeding to remove the executor has a collateral estoppel or res judicata effect on this case.