**ESTATE OF Lillian H. TULLY.**

Supreme Judicial Court of Maine.

Argued June 17, 1988.
Decided Aug. 10, 1988.

**1276**

Barry K. Mills (orally), Hale & Hamlin, Ellsworth, for appellants.

Wayne R. Crandall (orally), Collins, Crandall, Hanscom & Pease, Rockland, for appellee.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, SCOLNIK *, CLIFFORD and HORNBY, JJ.

HORNBY, Justice.

This appeal concerns the adequacy of corporate fiduciary behavior in dealing with a decedent's real and personal property in a politically troubled country. The Probate Court found that the corporate executor used due care and charged appropriate commissions and fees. Because those findings are not clearly erroneous, we affirm.

Lillian H. Tully died on May 3, 1972, a resident of Isle Au Haut. Her will nominated Robert Fleck as executor and First National Bank of Boston as alternate executor. She divided her estate between her two beneficiaries, sons Patrick and Sean Tully.[1] Jamaican assets of the estate are the subject of this proceeding.

In July, 1972, Mr. Fleck arranged for the appointment of ancillary administrators in Jamaica to manage the Jamaican assets—a house and contents. At the Beneficiaries' request, the Jamaican administrators im-

---

* Scolnik, J. sat at oral argument and participated in the initial conference but retired before this opinion was adopted.

1. Sean Tully has died and been replaced in the litigation by his widow, Elizabeth Tully.

mediately placed the Jamaican property up for sale. Before the assets could be sold, however, a radical political change occurred in Jamaica. Among other things, the new government devalued the Jamaican dollar and imposed severe restrictions on the expatriation of money from the country. Concerned that the proceeds from a sale of the Jamaican assets would be "blocked" under these new regulations, the Jamaican administrators contacted the Jamaican authorities requesting assurances that the Beneficiaries would be allowed to remove any such proceeds from the island. On March 1, 1973, the Bank of Jamaica stated that it had no objection, in principle, to the sale of the Jamaican property.

On July 23, 1973, the Jamaican assets were appraised at $72,000 in Jamaican dollars. Three weeks later, Mr. Fleck died and the Bank succeeded him as executor. As part of its duties, the Bank filed a federal estate tax return in which it reported the value of the Jamaican assets in American dollars by applying the exchange rate on the date of Mrs. Tully's death, May 3, 1972, to the July 23, 1973, appraisal value.

Offered for sale in a market depressed by social, political and economic unrest, the Jamaican assets were not sold until August, 1977. After fees and expenses, the estate netted approximately $28,000 in Jamaican dollars from the sale. When the proceeds were not received by October, 1977, the Jamaican administrators contacted the Bank of Jamaica requesting that it account for the missing funds. On May 1, 1978, after a number of such inquiries, the Bank of Jamaica informed the estate that the proceeds had been frozen in a "blocked" bank account pursuant to Jamaican law and could not be removed from the country. Although the First National Bank of Boston enlisted the assistance of the United States State Department and several banks, pressured the Jamaican co-executors to take appropriate action and contacted the Jamaican government itself, it has been unable to gain the release of the blocked funds for expatriation. The Jamaican funds appear to be earning interest, but an unfavorable exchange rate has greatly decreased their value in U.S. dollars.

When the attempts to retrieve the sale proceeds from Jamaica proved futile, the Beneficiaries filed suit seeking surcharges against the First National Bank of Boston, alleging that its mismanagement of the Jamaican assets and its preparation of the federal estate tax forms had caused the estate financial injury. They also asserted that the Bank overestimated its administrative fees (based on a fixed percentage of the decedent's estate) because it overvalued the Jamaican assets when calculating the gross estate. After reviewing the extensive documentary evidence and holding a hearing, the Probate Court determined that the Bank acted with due care in its administration of the estate and appropriately calculated its fees. The Beneficiaries have appealed, raising fifteen issues for review.

## STANDARD OF REVIEW

The findings of the Probate Court are based almost entirely upon documentary evidence. At one time this Court declined to give any deference to such findings, reasoning that where the trial court decides a factual issue on written evidence alone, the Law Court is as able as the trial court to judge the evidence. *Boulay v. Boulay*, 393 A.2d 1339, 1340 (Me.1978) (Superior Court proceedings); *In Re Longworth*, 222 A.2d 561, 564 (Me.1966) (Probate Court proceedings); 1 Field, McKusick & Wroth, *Maine Civil Practice* § 52.8 at 692 (2d ed. 1970). In a 1981 workers' compensation case, however, we rejected that approach, reasoning that the expertise of the workers' compensation commissioners justified deference to their factual findings even when based solely on documentary evidence and, "more importantly," that the "proper role of an appellate court" required that one court, the trial court, have the fact-finding role and that the appellate

**1278**

court defer to the trial court's findings. *Dunton v. Eastern Fine Paper Co.*, 423 A.2d 512, 514–15 (Me.1980). Commentators viewed *Dunton* as carving out for workers' compensation an exception to the previous rule. *See* 1 Field, McKusick & Wroth, p. 332 (2d ed. Supp.1981). Later, we made clear that we would follow *Dunton* in reviewing Superior Court decisions, as well, stating that "the fact that the record consists of documentary evidence does not entitle the parties to a trial *de novo* on appellate review." *Cushing v. State*, 434 A.2d 486, 494 (Me.1981) (citing *Dunton*, 423 A.2d at 514–15). Finally, in 1985, we explicitly applied the *Dunton* principle to review of Probate Court decisions. *Estate of Blouin*, 490 A.2d 1212, 1215 (Me.1985) ("the fact that on remand the matter was submitted on a written record does not entitle a party to a trial de novo on appellate review"). This rule against *de novo* review of even documentary evidence is consistent with Maine Probate Rule 52 which incorporates by reference M.R.Civ.P. 52. M.R.Civ.P. 52(a) provides: "findings of fact shall not be set aside unless clearly erroneous...."[2] Contrary to the Beneficiaries' suggestion this Rule is not discretionary in cases of documentary evidence.

■ We reiterate: even though a lower tribunal's findings of facts are based upon documentary evidence we will not review them *de novo*. *See generally Anderson v. Bessemer City*, 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).

We group the remaining issues on appeal into four categories: the selling of the Jamaican assets; the blocking of the Jamaican funds; the filing of the federal estate tax return; and miscellaneous items of fiduciary behavior.[3]

## ASSET SALE

■ The Beneficiaries make two major arguments in connection with the sale of the Jamaican assets. First they challenge the Bank's failure to accept a $65,000 (Jamaican) offer made in October, 1973. Second, they charge that the Bank failed to make a reasonable effort to sell the property.

The short answer to the first argument is that the Bank had in its possession an appraisal dated July 23, 1973, setting the value of the property at $72,000 (Jamaican). Clearly the Probate Court could find that this appraisal was a sufficient basis to ignore a letter of July 3, 1973, from a Jamaican attorney saying that there was little chance of getting more than $50,000 (Jamaican) and a previous letter from Fleck to Jamaican attorneys dated May 25, 1973, quoting an appraiser as saying that not more than $70,000 (Jamaican) should be asked. The Beneficiaries made no showing of any events occurring subsequent to the appraisal date and prior to the offer which would have justified the Bank in accepting an offer $7,000 (Jamaican) below the appraisal.

■ With respect to the efforts to sell the property, the Beneficiaries challenge the Bank's delay in obtaining a proper certificate of title, a necessary pre-condition to closing. They presented no evidence, however, that the certificate's unavailability in any way delayed a sale. They also charge the Bank with neglecting to consider a price adjustment in the midst of a social revolution and failing to give a broker an exclusive listing. There is no showing that either of these steps would ultimately have resulted in higher sale proceeds.

## BLOCKING OF THE JAMAICAN FUNDS

■ Apparently the blocking of the sale proceeds might have been avoided if the

---

2. The fact that the sentence goes on to say that "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses" does not detract from the significance of the first clause of the sentence.

3. Because it makes no difference in the outcome, we do not distinguish between the standards of care in effect for fiduciaries before and after the Probate Code went into effect on January 1, 1981. *See Estate of Tessier,* 468 A.2d 590, 595 (Me.1983).

estate had proved that the Jamaican assets were acquired with American funds. The Beneficiaries complain that the Bank waited until after the property was sold—several years after Mrs. Tully's death—before it began the search for evidence of the acquisition funds' origin. They introduced no proof, however, that an earlier search would have turned up qualifying evidence. Thus, the Probate Court had no evidence that any delay by the Bank caused any damage.

The Beneficiaries also argue that the Bank should have inquired whether estate payments for maintenance or administration in Jamaica could have qualified in this respect and thereby permitted repatriation of part of the sale proceeds. They state that "under the Jamaica statute it seems likely that some or all of these payments could have been credited." This statement appears to be nothing more than a surmise. No opinion of Jamaican law is offered to support the assertion. Certainly the Probate Court was in no position to evaluate its substance.

■ Finally the Beneficiaries argue that the Bank should have advised them to remove the personal property from Jamaica to the United States rather than sell it in Jamaica. They introduced no evidence that this would have improved their economic position, however—i.e., no showing concerning the costs of transportation, customs duties, etc. on the personal furnishings. Moreover, there is evidence that the Beneficiaries participated in the original decision to sell and were aware of the blocking problem well before the ultimate sale. Thus, there is no showing that further advice from the Bank would have improved their lot.

### FEDERAL ESTATE TAX RETURN

■ The Beneficiaries challenge the amount the Bank entered as the value of the Jamaican assets on the federal estate tax return. The Bank used the appraisal value of July 23, 1973, but applied the exchange rate as of the date of death, May 3, 1972. The Beneficiaries argue that the Bank should have used the substantially lower July 23, 1973, exchange rate (devaluation of the Jamaican dollar occurred in January, 1973). The result, of course, would have been a substantially lower federal estate tax. The Bank, however, was obliged to value the assets either as of the date of death or the alternate valuation date, six months later. 26 U.S.C.A. §§ 2031(a), 2032(a) (1979 & Supp.1988). Thus, the Bank was not entitled to take advantage of the devalued rate of July 23, 1973. *See Ithaca Trust Co. v. United States*, 279 U.S. 151, 155, 49 S.Ct. 291, 291, 73 L.Ed. 647 (1929); *First Nat'l Bank of Kenosha v. United States*, 763 F.2d 891, 893–94 (7th Cir.1985). Strictly speaking the Bank should also have acquired an appraisal that showed the assets' value as of the date of death on May 3, 1972. *See* 26 U.S.C.A. § 2031(a) (1979). Then its use of the May 3, 1972, exchange rate would have been logically consistent. In the absence of such an appraisal the Bank was obviously operating on the premise that the Internal Revenue Service would accept the later appraisal as the best evidence of value. It had no grounds, however, for using the later exchange rate.

■ The Beneficiaries also argue that the Bank should have entered on the return "no value" for the Jamaican assets or at least "no ascertainable value." Although, as it turned out, the Jamaican assets could not be converted to U.S. dollars, that is not to say that they had no value. The Beneficiaries could travel to Jamaica and there use the assets in the Jamaican economy. Thus, the Probate Court could legitimately find that although the determination of value in U.S. dollars might be difficult, there was no basis for entering "no value" on the federal estate tax return. The case they cite for entering "no ascertainable value," *Burnet v. Logan*, 283 U.S. 404, 412–13, 51 S.Ct. 550, 552–53, 75 L.Ed. 1143 (1931), actually enunciates a contrary principle, that a value—approximate or otherwise—is necessary in order to assess and close an estate.

■ Finally the Beneficiaries argue that the Bank had an obligation to file an amended return because of the later developments affecting the value of the property. They made no showing, however, that these later developments affected the proper valuation as of the date of death.

## MISCELLANEOUS ITEMS OF FIDUCIARY BEHAVIOR

■ The Beneficiaries assert that the Bank's administrative fees based on a percentage of the estate were excessive because the Bank overestimated the value of the gross estate.[4] In particular, they argue that a $115,000 American dollar value initially assigned to the Jamaican assets was unsubstantiated and inappropriately high. After estimating its fees based on the gross estate, however, the Bank voluntarily reduced its charges by $1,100 to compensate for any inaccuracies in calculations. Although we are unable to determine the exact source of the $115,000 figure, the Probate Court could legitimately find that the $1,100 reduction compensated for any inflation of the gross estate caused by that number and that the Bank's fees were justified.

■ The Beneficiaries also argue that the Bank should be surcharged for its failure to file accounts in a timely manner and its failure to file any account for the lease or sale of the Jamaican assets. So far as the lateness of the accounts is concerned, they have demonstrated no injury. With respect to the failure to file any accounts concerning rental or sale of the Jamaican assets, the Probate Court could legitimately find that the Bank satisfied its fiduciary duty by pressuring the Jamaican administrators and the Bank of Jamaica to account, and by enlisting the assistance of the State Department and other banks in its fight to locate the funds.

■ The Beneficiaries contend that the Bank should be surcharged because it has not discharged the estate's Jamaican attorney. (He was the Tullys' family attorney prior to Mrs. Tully's death and his initial selection as attorney is, therefore, not challenged.) But although the situation in Jamaica is obviously of great frustration and financial detriment to the Beneficiaries, they have not shown any misconduct on the part of the Jamaican attorney that required the Bank to discharge him. Instead the Probate Court could legitimately find that

he has coped as well as possible with the turmoil existing in Jamaica during the times in question.

■ Finally, the Beneficiaries argue that the Bank should be surcharged because it refused until 1984 to distribute over $30,000 in cash. The Probate Court made no express finding on this issue, but it must be assumed that the court found for the Bank upon all issues of fact necessarily involved in its ultimate decision in favor of the Bank. *Herrick v. Theberge,* 474 A.2d 870, 875 (Me.1984); *Harmon v. Emerson,* 425 A.2d 978, 981 (Me.1981). Implicit in the Probate Court's ruling was the finding that the Bank was not unreasonable in holding the $30,000 against its possible expenses (including the Jamaican administrators' fees) in continuing the effort to obtain the release of the blocked funds. In light of the unusual circumstances involving the Jamaican blocked account, we find no reversible error in such a finding.

\*     \*     \*     \*     \*     \*

■ In summary, the standard against which the Bank's conduct as a fiduciary is measured is based upon what it knew or should have known at the time, *Estate of Baldwin,* 442 A.2d 529, 534 (Me.1982); the surcharges the Beneficiaries seek are allowable only in instances where damages can be proved; and we review the Probate Court's factual findings only for clear error. Although there is room for differences of opinion on the adequacy of the Bank's management of these foreign assets, we cannot say that the Probate Court was clearly erroneous in its findings that the Bank acted with due care and charged appropriate commissions and fees.

Accordingly, the entry is:

JUDGMENT AFFIRMED.

All concurring.

---

**4.** The parties agree that, at the time, the Bank was entitled to charge administrative fees based on a percentage of the gross value of the estate.

*See* 18 M.R.S.A. § 554, *repealed by* P.L.1979, ch. 540 (eff. January 1, 1981).