STATE OF MAINE                          BUSINESS AND CONSUMER COURT

Cumberland, ss.


BARBARA T. MARTIN, Trustee
OF MARY LOUISE MIKOLS LIVING TRUST
U/T/D October 17, 2012

        Petitioner/Plaintiff/Counterclaim Defendant

               v.                                    Docket No.BCD-CV-14-07 ✓

CYNTHIA C. HARRIS, ELIZABETH H. MIKOLS,
JULIA A. HARRIS and APRIL F. PARRAS,
beneficiaries of the Mary Louise Mikols Living Trust
U/T/D October 17, 2012

        Respondents/Defendants / Counterclaim Plaintiffs

JUDITH MONTOYA, DAVID J. MARTIN,
CATHERINE E. MARTIN,  JACK C. MONTOYA,
JAMES C. MONTOYA and GUINEVERE M. HILL
beneficiaries of the Mary Louise Mikols Living Trust
U/T/D October 17, 2012

        Respondents/Defendants

## DECISION

This case involves a dispute over the administration of the Mary Louise Mikols Living Trust dated October 17, 2012 (the "Trust").   The Petitioner/Plaintiff [hereinafter "Plaintiff"], Barbara Martin, and all of the Respondents/Defendants [hereinafter "Defendants"] are all family members of the settlor, Mary Louise Mikols.

The case came before the court for a jury-waived trial on all issues beginning June 23, 2015, and continuing thereafter until completed.   In the course of trial, the parties presented sworn testimony, exhibits, stipulations and proposed findings of fact and conclusions of law.

1

After the trial, the parties submitted updated proposed findings of fact and conclusions of law, at which time the court took the case under advisement.

Based on the entire record, the court hereby adopts the following findings of fact and conclusions of law, and renders judgment as set forth below.

*Background Facts*

1.     Plaintiff Barbara T. Martin is the youngest child of Mary Louise Mikols. She is also the named successor trustee under the terms of the Mary Louise Mikols Living Trust U/T/D October 17, 2012 ["the Trust"].

2.     Defendants Elizabeth H. Mikols, Cynthia C. Harris, and Judith E. Montoya are all children of Mary Louise Mikols and sisters of Barbara, and are named beneficiaries of the Trust.

3.     The other named Defendants, April F. Parras, Julie A. Harris, Lori Esparza, Guinevere M. Hill, Jack Montoya, James Montoya, David Martin, and Catherine Martin are grandchildren of Mrs. Mikols and are also named beneficiaries of the Trust.

4.     Defendants April F. Parras, Julie A. Harris, and Lori Esparza are the children of Defendant Cynthia C. Harris. Defendant Guinevere M. Hill is the child of non-party/non-Defendant Mitchell Mikols. Defendants Jack Montoya and James Montoya are the children of Defendant Judith E. Montoya. Defendants David Martin and Catherine Martin are the children of Plaintiff Barbara T. Martin. Defendant Elizabeth H. Mikols has no children.

5.     Mitchell Mikols and Monica Frey are also children of Mary Louise Mikols, but they were expressly excluded from the Trust and are not parties to this proceeding.

6.     Defendants Cynthia Harris, Elizabeth Mikols, Julie Harris, April Parras and Lori Esparza have joined in filing a counterclaim against Plaintiff Barbara Martin. They are

2

referred to as the "Counterclaimants" in this Decision to distinguish them from the Defendants who have not filed a counterclaim.

7. Prior to her death on October 20, 2012 at the age of 85, Mary Louise Mikols was a resident of Eagle Lake, Maine. She had been widowed some years previously, and was the sole owner of several pieces of real estate located around the country.

8. One of these properties was a residence in Imperial Beach, California that had been in the Mikols family for many years and that been used as a family gathering place even after the Mikols children had grown up and moved away. The residence had considerable sentimental value within the family, and Mary Louise Mikols wanted it to remain a place where members of the extended family could spend time together. The property is referred to hereinafter as "the Imperial Beach property."

9. The other real estate included undeveloped land in Oroville, California, and two residences in Eagle Lake, Maine. The residence on Lower Main Street, Eagle Lake, also known as the Blue House, was owned by Mary Louise Mikols outright, and it also had been used as a family gathering place and had sentimental value for the extended Mikols family. The other Eagle Lake property, on Albert Street, was owned by Mary Louise Mikols as a joint tenant with her daughter, Judith Montoya.

10. In addition to real property, Mary Louise Mikols had extensive personal property, tangible and intangible. Her tangible property was located, not only in the three residences she owned, but also in storage units located in several states around the country where she and her husband had lived. The intangible property included well over a dozen checking and savings accounts in various financial institutions; an annuity; two investment

3

accounts, and a promissory note from the purchaser of real property she had owned in Port Orchard, Washington, secured by a junior mortgage on the property.

11. Prior to the summer of 2012, Mary Louise Mikols ("Mary Louise") had executed various wills disposing of her property and designating her eldest daughter Elizabeth as personal representative or executor. Elizabeth also at one point held a power of attorney granted by her mother.

12. During 2011 and 2012, Mary Louise Mikols had several conversations with her daughters, during which she expressed varying plans and intentions for disposing of her property.

13. In April of 2012, for example, while Elizabeth Mikols and her husband, Cynthia Harris and her husband, and Mary Louise Mikols were all at the Imperial Beach property, Mary Louise told Cynthia and Elizabeth that her plan was to leave Imperial Beach to them as joint tenants, on the understanding that they would hold it for the benefit of the whole family to use and enjoy. However, not long after that, encouraged by her daughter Barbara to get expert advice in estate planning, Mary Louise elected, on advice from her estate-planning attorney, to create what became the Trust, to deal with all of her various types of property.

14. On June 29, 2012, Mary Louise Mikols met with attorney William J. Smyth, who is licensed to practice in Maine, to discuss her estate plan. Attorney Smyth had done estate planning work for Barbara Martin and her husband, and they recommended him to Mary Louise Mikols for the same purpose.

15. The June 29, 2012 meeting between Mary Louise Mikols and attorney Smyth took place at attorney Smyth's office in Fort Kent, Maine, and lasted about an hour and a half. No one else was present. Mary Louise Mikols told Mr. Smyth that she wanted to do a new

4

estate plan primarily to change her personal representative to be her youngest daughter, Barbara. After attorney Smyth had obtained information about her financial circumstances and also about her wishes, he discussed with her the benefits of using a trust as her primary estate planning vehicle. One benefit of the trust vehicle over a will would be to avoid having to probate her estate in each of the jurisdictions where Mary Louise Mikols owned property. Another benefit was to provide for her property in the event of her incapacity.

16. Attorney Smyth met with Mary Louise Mikols a total of three times, and spoke with her by telephone several more times.

17. On August 2, 2012, Mary Louise executed what Mr. Smyth termed a "stopgap" will and other documents. The will was a stopgap measure because it was meant to be superseded by a pour-over will and trust which, as of August 2, Mr. Smyth had not completed. The other documents she executed included an advance healthcare directive and a durable power of attorney, both of which designated Barbara as the primary agent of Mary Louise Mikols.

18. Mary Louise Mikols scheduled another appointment with attorney Smyth for late August, presumably for the purpose of executing the trust documents that would supersede the stopgap will.

19. During his conversations with Mary Louise Mikols, Mr. Smyth became aware that many of her bank accounts were held with or for the benefit of various family members, as either payment on death (POD) accounts or joint accounts. Mr. Smyth drafted the trust and pour-over will documents in anticipation of the funds in the bank accounts coming into the trust. On several occasions, he explained to Mary Louise Mikols how crucial it was for

5

ownership of the accounts to be such as to enable them to flow into the trust, so that it could be fully funded.

20. At some point earlier, Mary Louise Mikols had decided to pay a visit in September 2012 to her daughter, Judith Montoya, and her daughter's family in Kentucky. She also decided to use the visit as the occasion for a routine endoscopy, presumably so that family members could take her to and from the doctor's office and be nearby in the event of any complications.

21. Mary Louise Mikols cancelled her August 28, 2012 appointment with Mr. Smyth. Why she did is somewhat open to speculation—one possibility is that she was having misgivings about the trust idea, but an equally plausible possibility is that she thought she could execute the trust documents after she had returned from Kentucky. In any event, she did not execute any of the trust documents prior to leaving Maine for Kentucky.

22. Attorney Smyth had completed the trust documents, which included a pour-over will designed to move her property into the trust, but he did not send them to her in advance. It can be inferred that he expected her to reschedule the cancelled appointment once she had returned from Kentucky. He never spoke to Mary Louise after she cancelled her August 28th appointment and never explained or reviewed the trust documents with her.

23. On September 5, 2012 Mary Louise Mikols entered the hospital to undergo an endoscopy procedure. The procedure went badly, and she was hospitalized. Barbara contacted attorney Smyth to advise him of her mother's condition, and requested that he send her the advance healthcare directive and other information pertinent to Mrs. Mikols' care, which Smyth had prepared and Mary Louise Mikols had signed as an adjunct to her will on

6

August 2, 2012. He sent those documents, and also the trust documents he had drafted the same day.[1]

24. Between September 8, 2012 and early October the evidence establishes that Mary Louise was able to sit up, converse, read and generally communicate, although she remained hospitalized. Barbara and the other family members who were with her during this time were increasingly hopeful, as she seemed to rally and gain strength, that she would recover, so Barbara held off on discussing the trust documents until she was stronger.

25. However, around mid-October, her condition worsened and her family grew concerned that she might not survive. On October 17, 2012, as her mother's condition continued to deteriorate, Barbara decided that it was time for her to act pursuant to the power of attorney her mother had signed, because her mother was too incapacitated to read and sign any documents herself. Based on conversations with her mother and attorney Smyth, Barbara believed that it was her mother's wish and intention for the trust framework that Mr. Smyth had drafted to be put into effect, which could happen only if the trust documents were executed while Mary Louise Mikols was alive.

26. Accordingly, Barbara contacted attorney Smyth again and asked that he send her the pour over will, trust, and related documents. He sent the documents on October 17, 2015 via electronic mail, and he also sent instructions on how Barbara could execute them in lieu of her mother, if Mary Louise Mikols was unable to do so herself.

27. Acting for her mother pursuant to the power of attorney, Barbara Martin executed the Mary Louise Mikols Living Trust and the pour-over will, and the other related documents prepared by attorney Smyth. She also executed a deed to transfer one of the two Eagle Lake

---

1 His initial transmittal included an incorrect version of the Trust document that he later corrected.

7

properties (the "Blue House") into the Trust and authorized Mr. Smyth to contact a California attorney to "get things in motion" to transfer the Imperial property and the Oroville land into the Trust.

28. Mary Louise Mikols died on October 20, 2012, three days after her daughter had executed the Trust, the pour-over will and the related documents.

29. Except two of Mary Louise Mikols's children—Mitchell A. Mikols, Jr. and Monica A. Frey—and nearly all their descendants,[2] who are excluded pursuant to Article Two of the Trust, all of her descendants are beneficiaries of the Trust. Ex. 1.

30. According to its terms the Trust was to be funded with the proceeds of bank accounts held by Mary Louise. The specific accounts that were meant to fund the Trust were listed in Schedule A to the Trust. *See* Ex. 1, Schedule A. However, most of the bank accounts listed in Schedule A were either joint accounts or payment on death (POD) accounts that Mary Louise Mikols had set up to benefit different children and grandchildren.

31. The property transferred into the Trust included the Imperial Beach property, the Blue House property in Eagle Lake, the undeveloped land in Oroville, the promissory note secured by property in Port Orchard, Washington, about $18,590 in cash, a 2006 Dodge Van worth $4,125, and some of the funds in some of the accounts listed on Schedule A.[3]

32. Between her mother's death on October 20, 2012 and the middle of December 2012, Barbara confirmed that many of the various bank accounts listed in Schedule A to the Trust were POD or joint accounts held by Mary Louise Mikols jointly with or for the benefit of her

---

2 Although Article Two of the Trust excludes all of Mitchell and Monica's descendants, Guinevere Mikols, Mitch's daughter, is listed as a beneficiary of the subtrust of the Blue House. Ex. 1.

3 The other Eagle Lake property was transferred by operation of law outside the trust because Mary Louise Mikols and Judith Montoya owned it as joint tenants with rights of survivorship.

8

children and grandchildren. Barbara was also able to determine the value of each account. She also learned that her mother had not done anything to change the ownership designations on the jointly held and POD accounts to her name only, so as to enable them to flow into her estate and thence into the Trust, meaning that the funds in joint or POD accounts transferred by operation of law to those designated as joint owners or POD recipients.

33. In a November 23, 2012 email message to her sister Judith and the other Trust beneficiaries, Barbara forwarded scanned copies of the Trust documents.

34. The total funds in all the bank accounts listed in Schedule A to the Trust was about $240,000 as of the date of Mary Louise Mikols' death, but only about $100,000 actually flowed into the Trust via the pour-over will. Of the $140,000 that went directly to the beneficiaries of the various accounts instead of into the trust, Barbara herself received about $60,000.

35. However, recognizing that the Trust would be underfunded unless more of the account proceeds were moved into it, Barbara decided to find out if any of the beneficiaries of the accounts were willing to turn over some or all of the proceeds from the Schedule A accounts they had inherited to the Trust. She herself was willing to do so, but not by herself.

36. In December 2012, Barbara sent an email message regarding the accounts to the beneficiaries of the Trust, most or all of whom were also beneficiaries of the bank accounts that were supposed to have been swept into the Trust. Her email explained the situation and asked the recipients of funds from the accounts if they were willing to turn over the funds to the Trust.

37. At the point they received her inquiry, the Trust beneficiaries did not have specific information about the value of the assets that did go into the Trust; the amounts they could

expect to receive from the Trust, or even what they could expect to receive from any of the Schedule A accounts that now belonged to them.

38. Barbara had decided to withhold specifics about what each beneficiary could expect to receive from the Trust and from the accounts because she foresaw conflict if the beneficiaries all were told what each other stood to get—"I know my family," was her way of saying that. Barbara reached that decision after consulting with Judith Montoya, the sister with whom she felt closest. At various times during her work as trustee, Barbara relied on Judith Montoya for counsel and advice.

39. In deciding not to share financial details with all beneficiaries, Barbara may have had a valid point in terms of the family dynamics, but it was still a mistake to withhold the information, because she was asking them to give back funds they were entitled to keep without giving them the information they needed to make an informed decision. The predictable response she got, from her sister Elizabeth and others, was to ask for more information before responding one way or the other.

40. Two months later, in February 2013, that Barbara sent out information to those who stood to benefit from the bank accounts, as joint owners or POD recipients, on how to collect what they were due.

41. Around the same time, tension developed between Barbara and her sisters Elizabeth and Cynthia about personal property of Mary Louise Mikols at the Imperial Beach property. However, after all concerned had time to move beyond the tension, they were able to resume more cordial communication, at least for a while longer.

42. In late March or early April of 2013, Eric Small, who owned the property next door to the Imperial Beach property, contacted Barbara and told her that he was planning on

10

selling his property to a developer, and the developer had voiced concern about vagrants and conditions at the Imperial Beach property.

43. As a result of her contact with Mr. Small, Barbara went to the Imperial Beach property to investigate. She elected not to contact her sister, Cynthia Harris, even though Cynthia had been named as a co-trustee of the Imperial Beach property subtrust, and lived only about an hour and a half from Imperial Beach. Barbara Martin felt that she was primarily responsible for the property, since the Trust was in its administrative phase, and her decision not to involve her sister Cynthia was not an unreasonable one. On the other hand, when Cynthia found out later, it fueled her suspicion about Barbara's motives.

44. Prior to going to the Imperial Beach property, Barbara contacted the San Diego Sheriff's Department about meeting her at the property. Upon arriving at Imperial Beach, Barbara learned that there were no trespassers or vagrants there, and that the only person there was the handyman whom her mother had allowed to live in a shed on the property.

45. Still, to protect and secure the property, Barbara had all the locks changed, a step well within her authority as Trustee during the administrative phase. In light of the uncertain future of the Trust given the funding shortfall, she also had discussions with the developer who was planning to purchase the neighboring Small property about the possibility of his purchasing the Imperial Beach property and converting it and the neighboring Small lot into a condominium development.

46. One of the problems Barbara encountered regarding the Imperial Beach property was a potential easement dispute regarding the adjacent Small property. She retained attorney Robert H. Lynn to handle the easement question and deal with the potential buyer.

11

47. On April 23, 2013 Barbara received a letter from Mr. Lynn giving a report on his visit to the property. In his letter, Mr. Lynn twice emphasized that Barbara consult with her sisters prior to making any decisions on the property and advised her: "I do think you need to discuss these issues with your sisters and decide on a unified approach to Mr. Sweeney." On April 24, 2013, Barbara forwarded the report to Judith Montoya, the one sister whom she evidently trusted, with a message: "Can we talk?" Two days later, Barbara forwarded the report to her sisters Cynthia and Elizabeth, along with her sister Judith, with the following message:

> Hi All!
> The Trust's California property attorney met with the developer who is purchasing the property next to mom's house. Attached is his report for your information.
> I am taking the proposed offers under advisement and will let you know what I decide.

48. Understandably concerned that her input on what to do with the Imperial Beach property was not being requested, Cynthia Harris twice asked Barbara Martin to confer with her before making any decisions about selling the property. Barbara chose not to do so, electing instead to notify her sisters that she had decided to sell Imperial Beach in exchange for a condominium unit and some cash.

49. Both Cynthia and Elizabeth asked her to reconsider, with Cynthia questioning her authority to sell the Imperial Beach without the consent of the other sisters, and Elizabeth encouraging Barbara to take more time to decide what to do.

50. Barbara and Judith did not respond positively to the concerns and lack of support expressed by Cynthia and Elizabeth. They felt, rightly or wrongly, that Elizabeth wanted to remove Barbara as Trustee.

51. On April 30, 2013, Barbara drafted and sent another email to Judith and Mr. Smyth to review before she sent it to others. The text of this email is consistent with her

12

statement to Cynthia that Barbara had decided to sell Imperial Beach. The pertinent parts of

Barbara's draft email state:

> As you know, there has been much concern about the disposition of mom's house in Imperial Beach. I greatly appreciate all of the input and advice each of you has offered, and I thank you for that . . . The reality is, the Trust does not have sufficient cash assets to satisfy its obligations. There are past debts, current expenses, as well as the projected/ongoing expenses. Now, in light of the new legal battles related to IB the Trust is enduring, yet more legal expenses. Therefore, as Trustee, I must secure cash with the assets available. I will by liquidating such assets to accomplish this, namely mom's house in Imperial Beach.

52.     Ultimately, Barbara did not send the April 30, 2013 draft email to Elizabeth and

Cynthia.   Still, alarmed at the direction that Barbara seemed to be heading, Cynthia sent the

following email on May 1, 2013:

> Barb,
> I haven't heard back from you since your last email. I need in writing, from the Trust, the process that allows the sale of the 124 Donax Imperial Beach property. I need a key to my property in Imperial Beach, California now.

Barbara's response was as follows:

> Sorry I haven't emailed you, but there really isn't anything new.
> In response to your email, you don't own any property at 124 Donax Avenue, Imperial Beach, California. Mom's trust owns the property at 124 Donax Avenue. As you know, I am the trustee of mom's trust. I have provided you with a copy of the trust. Article Twelve explains the powers of the trustee to sell trust property. Specifically, see Section 12.17.

Cynthia responded to this email with another demand for a key.   Barbara refused to

supply a key and responded as follows:

> As a trustee, it is my fiduciary duty to protect the assets of the trust. As you know, the locks have been changed on 124 Donax Avenue, to protect it. No one has permission from the trust to enter, or be on the property at 124 Donax Avenue, Imperial Beach, California, except the attorneys for the trust and the handyman who has been contracted to do repairs. I have contacted the Sheriff's department to alert them to any possible intruders or trespassers.
>
> Until the trust is administered in proper order, the trust will retain the keys to 124 Donax Avenue, Imperial Beach.

13

53. On May 7, 2013 Barbara sent an email to the three sisters (other than Monica) that due to the financial condition of the Trust and the "significant legal expenses to protect the house" she had concluded that Imperial Beach should be put on the market and sold, but expressing a willingness to consider alternatives:

> Once the house is sold, the trust will be able to meet its obligations with significant funds left over. . . . If you have any ideas that would allow us to hold onto mom's IB house, I would like to hear them.

54. It does not appear that anyone responded to Barbara's request for "ideas" with any alternative to sale of the Imperial Beach property that would have allowed the Trust to meet all its obligations. Later in May 2013, Cynthia wrote directly to attorney Smyth, volunteering to absorb all the costs of maintaining the Imperial Beach property in exchange for "complete ownership" of the entire property, claiming that this would be in keeping with the "true wishes" of Mary Louise Mikols. Mr. Smyth replied, "It may not be practical to hold the IB house as provided in your mother's trust . . . but it is unrealistic for you to believe that it will be given to you."

55. Both Cynthia and Elizabeth testified at trial that had they would have been willing to pay the expenses related to Imperial Beach in exchange for Cynthia to be able to live there, had they been told that this was an option. However, it does not appear that either of them actually proposed that. In fact, Cynthia's proposal that she be granted complete ownership in exchange for paying expenses was contrary to the terms of the Trust and would have been to the detriment of other beneficiaries to whom the Trust had granted a right to use the property.

14

56. On the other hand, Barbara's decision to sell the Imperial Beach property was made and communicated to the other sisters without a sufficient explanation of the financial circumstances underlying her decision, so the opposition she encountered was largely justified.

57. On Monday, May 13, 2013 Barbara sent another email to attorney Smyth and Judith for their review. In the paragraph preceding the text of her draft, Barbara noted "I've made some additional changes to the letter from last week." Ex. 95. This preliminary text indicates that the original draft was written around the same period Barbara was soliciting suggestions on Imperial Beach. In this draft email, Barbara again stated that she had decided to sell Imperial Beach:

> Dear Judith, Cynthia and Elizabeth,
> Thank you for offering some suggestions concerning the trust's property in Imperial Beach. . . . The trust continues be in a cash crunch, and this must be resolved.
>
> Unfortunately, the one idea suggested (besides selling) will not provide sufficient funds in a expeditious manner to satisfy the current and projected expenses of the trust. I will also not allow the trust to go bankrupt as has been suggested. Therefore, the trust is forced to sell the one asset that will satisfy all of its financial obligations. The trust will offer the property located at 124 Donax Avenue, Imperial Beach CA for sale. The trust will offer the property to family members first. If no family member can or will purchase the property, the trust will put the property up for sale to the general public.

Although Barbara never sent this email to Cynthia and Elizabeth, she and Mr. Smyth testified that by May 13, 2013 Barbara had concluded that the only option available to her was the sale of Imperial Beach.

58. On May 13, 2013 David Jarvis, a California attorney Cynthia retained to protect her interest in the Trust, wrote to Mr. Smyth requesting information regarding the administration of the Trust and providing Mr. Smyth with an Appointment of Cynthia Harris as Co-Trustee pursuant to Section 3.03 of the Trust. Ex. 94. On May 23, 2013, Mr. Jarvis filed in the San Diego County Recorder's Office an Affidavit of Death of Successor Co-Trustee

15

pursuant to California law. Ex. 103. A copy of this filing was sent to Mr. Smyth on May 26, 2013.

59. A few days later, on June 1, 2013, Barbara faxed to the San Diego County Sheriff a Trespass Arrest Authorization authorizing the Sheriff to arrest Cynthia or any of the other beneficiaries for trespass if they attempted to take possession of the property.

60. Relations among the four sisters deteriorated further during the summer of 2013, with Barbara and Judith on one side and Cynthia and Elizabeth on the other. By August, Barbara had decided that she needed to seek court intervention. In an email dated August 6, 2013 Barbara wrote to Mr. Smyth stating that she wanted to liquidate the Trust: "I would like to proceed with a petition requesting instructions. I would like to sell all property and close this thing out."

61. By the middle of July 2013, the Trust and Estate had expended a total of $34,286.25, of which a combined total of $17,876.48 related to Imperial Beach and the Blue House. The cash available to the estate at the time amounted to $25,575.33.

62. In August 2013 Barbara sent emails to all the grandchildren beneficiaries setting forth the conditions for using the Blue House in Maine. In an email to Lori Esparza, Barbara stated: "so long as [there] are funds in the Trust, the Trust will pay for the properties." And "so long as it has funds, [the Trust] will maintain all properties." Barbara had also emailed Lori stating [the Trust will take care of the property]. At trial Barbara acknowledged that the Trust never had funds to support the Blue House, but testified at various times that she would sustain the burden of paying for the Blue House: "there were things I was willing to do outside of [the trust to operate the Blue House] with my own funds." The Counterclaimants

16

assert that such actions reflect Barbara Martin's preference for the Blue House over the Imperial Beach property.

63.    In mid-August 2013, Cynthia took possession of Imperial Beach, without Barbara's consent, and began to pay certain Imperial Beach expenses.  Cynthia has been occupying the Imperial Beach property since that point.

64.    On September 6, 2013, attorney Richard Solman, acting on Barbara's behalf, filed the Petition seeking instructions in Aroostook County Probate Court.  The case was removed to Superior Court and later transferred to this court.

*Analysis*

A.    Duties of Trustee and Personal Representative

Under Maine's version of the Uniform Probate and Trust Codes a trustee and personal representative owes the beneficiaries of a trust or an estate fiduciary duties of good faith,[4] loyalty,[5] impartiality,[6] prudence,[7] and keeping beneficiaries informed.[8]  The Trust Code provides, "A trustee shall administer the trust as a prudent person would, by considering the purposes, terms, distributional requirements and other circumstances of the trust.  In satisfying this standard, the trustee shall exercise reasonable care, skill and caution."  18-B M.R.S. § 804.

> A trustee has a general duty "to administer a trust expeditiously for the benefit of the beneficiaries," and to "keep the beneficiaries of the trust reasonably informed of the trust and its administration." 18–A M.R.S.A. §§ 7–301, 7–303 (1998), *repealed by* P.L.2003, ch. 618, § B–11 (effective July 1, 2005). A trustee is required to use good faith and prudence consistent with this duty, and "must take care to enlighten his judgment." *Estate of Baldwin,* 442 A.2d 529, 532 (Me.1982).

*In re Estate of Silsby,* 2006 ME 138, ¶ 22, 914 A.2d 703.

---

[4] 18-B M.R.S. § 801.

[5] 18-B M.R.S. § 802.

[6] 18-B M.R.S. § 803.

[7] 18-B M.R.S. § 804.

[8] 18-B M.R.S. § 813.

17

Sections 802 and 803 of the Trust Code require that a trustee "administer the trust solely in the interests of the beneficiaries," and "the trustee shall act impartially in investing, managing and distributing the trust property, giving due regard to the beneficiaries' respective interests." 18-B M.R.S. §§ 802-03. The Law Court has set forth the elements of the duty of impartiality as follows:

> "The duty to act impartially does not mean that the trustee must treat the beneficiaries equally. Rather, the trustee must treat the beneficiaries equitably in light of the purposes and terms of the trust." Unif. Trust Code § 803 cmt., *included with* 18–B M.R.S.A. § 803 (2012). In sum, "it is the trustee's duty, reasonably and without personal bias, to seek to ascertain and to give effect to the rights and priorities of the various beneficiaries or purposes as expressed or implied by the terms of the trust." Restatement (Third) of Trusts § 79 cmt. b.

*In re Estate of Greenblatt*, 2014 ME 32, ¶ 15, 86 A.3d 1215 (emphasis added). Comment (b) to Section 79 of the Restatement goes on to say:

> Impartiality does mean that a trustee's treatment of beneficiaries or conduct in administering a trust is not be influenced by the trustee's personal favoritism or animosity toward individual beneficiaries, even if the latter results from antagonism that sometimes arises in the course of administration.

*See* Volume 3, Restatement (Third) of Trusts § 79 cmt. b at 128 (emphasis added).

B. The Acts and Omissions of Barbara Martin as Trustee

Some of the Counterclaimants' contentions about Barbara Martin's acts and omissions and trustee are valid, and others are not.

As a foundational matter, the Trust, the pour-over will and the other elements of Mary Louise Mikols' estate plan all are valid, and reflect Mary Louise Mikols' actual wishes and intentions. Clearly, Mary Louise Mikols said different things at different times regarding her wishes and intentions, but it was when she met alone with an estate planning attorney that her wishes and intentions truly coalesced into a definite plan. Although Mary Louise Mikols relied on her youngest daughter, Barbara Martin, in a variety of ways, including obtaining the

18

services of attorney Smyth, the evidence does not support any finding of undue influence on the part of Barbara Martin. The evidence also establishes that Barbara Martin's execution of the relevant documents was a valid and proper exercise of her rights under the power of attorney she had been granted, and was effective to create the Trust.

Second, the evidence demonstrates that Barbara Martin acted throughout with subjective good faith—that is, her decisions were based on her belief that she was acting in the best interests of the Trust and all its beneficiaries. At no time she did attempt to profit personally, and in fact she expended massive amounts of time and considerable funds on behalf of the Trust, for all of which she has yet to be reimbursed or compensated.

That said, however, it is equally clear that her exercise of judgment and discretion was clouded by family dynamics. She and the next youngest sister, Judith Montoya, were close, and Barbara confided in Judith regularly and sought her advice, along with that of attorney Smyth. On the other hand, Barbara did not have the same close relationship with her other sisters Cynthia and Elizabeth, and at times engaged in personal criticism of them and others in e-mails to her sister Judith.

Dysfunctional family dynamics also permeated Barbara's attitude toward Trust assets. Among the properties owned by Mary Louise Mikols, the Imperial Beach property and the Blue House were the two that Mary Louise Mikols wanted to be held in trust for the use and enjoyment of her descendants. Barbara shared that attitude toward the Blue House, as evidenced by her willingness to spend her own assets to preserve and maintain it, but did not share her mother's regard for the importance of the Imperial Beach property to the extended Mikols family. On the other hand, she did take significant steps to protect and conserve the Imperial Beach property.

19

Section 813 of the Trust Code requires that: "A trustee shall keep the qualified beneficiaries of the trust reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests." 18-B M.R.S. § 813.

The Counterclaimants' criticisms of Barbara Martin's reporting and sharing of information are valid, but only to an extent. Section 11.13 specifically permitted Barbara Martin to withhold the terms of the Trust from the beneficiaries, but she in fact emailed copies of the Trust to her sisters and the nieces who were named as beneficiaries. She also met the minimal reporting requirements set forth at section 11.12 of the Trust,[9] by means of the federal fiduciary tax return, and also satisfied the annual reporting requirement of the Trust Code. *See* 18-B M.R.S. § 813(3). However, the Code imposes a general and ongoing requirement that a trustee "keep the qualified beneficiaries of the trust reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests," 18-B M.R.S. § 813(1).

In some cases, an annual report may be sufficient to satisfy any and all reporting, but this was not one of them. On several occasions, Barbara Martin declined to provide information requested by Trust beneficiaries, apparently because she thought providing the information would generate or increase family conflict. This may indeed be what she believed and in fact it may also have been permissible under the minimal information-sharing and

---

9 Article 11 of the Trust provides that "After my death, my Trustee must provide an annual accounting to the Qualified Beneficiaries of any trust created under this trust unless waived by the Qualified Beneficiaries. The annual accounting must include the receipts, expenditures, and distributions of income and principal and the assets on hand for the accounting period. A copy of the federal fiduciary tax return filed for a trust during the accounting will satisfy this reporting requirement."

Attorney Backer testified that the provision of tax returns alone as an annual accounting does not comply with Maine law, meaning that the minimal level of reporting required by Article 11 of the Trust does not comply with the provisions of 18-B M.R.S. § 105(3) and 813. If the Trust is indeed inconsistent with Maine law in this respect, that is not the fault of Barbara Martin and thus it does not support the Counterclaimants' claim that she should be removed as Trustee.

20

reporting requirements of Article 11, but the consequence of not providing requested information was to fuel suspicion and skepticism on the part of the beneficiaries, especially on the part of those inclined to find fault with her regardless. She affirmatively needed the cooperation and support of all her sisters, and the best way to have obtained their cooperation and support was to be totally forthcoming and open with information, even if she had the right not to share it. Her motivation in withholding information was to avoid further conflict within the family, but the effect of keeping information back was to deepen the estrangement between her and the Counterclaimants.

The Counterclaimants' criticism of her decision to loan personal funds to the Trust ignores the practical reality of the situation. The loans themselves did not violate any fiduciary or other obligation of the Trustee. The Trust Code specifically permits a trustee to advance "money for the protection of the trust," *see* 18-B M.R.S. § 709(2), and Barbara Martin believed and intended that her advances in the form of loans were to protect the Trust. The conflict of interest statute cited by the Counterclaimants applies to transactions for the trustee's own "personal account," *i.e.* benefit, *see id.* § 802(2), but none of Barbara Martin's advances or other transactions inured to her personal benefit. Whether she is entitled to reimbursement of the advances is a different issue, resolution of which depends largely on whether the advances in fact benefited the Trust. As noted below, the issue of whether any of the parties who are seeking reimbursement for attorney fees and costs is not resolved in this Decision and will be resolved later.

The Counterclaimants are right in saying that sale of the Imperial Beach property should have been a last resort in light of the fact that Mary Louise Mikols wanted the property to be available for her descendants. They are also right in criticizing Barbara Martin's

21

opposition to Cynthia Harris moving into the property. Section 6.01 of the Trust specifically contemplates that Cynthia could make her primary residence at the Imperial Beach property.

Despite the specific directive to keep the Imperial Beach property available for use by the extended family, Barbara Martin decided to sell the Imperial Beach property without any meaningful effort to seek input from those most affected by the decision—Cynthia, Elizabeth and other Counterclaimants. Although she rationalized her actions on the basis of wanting to avoid open conflict within the extended family, her actions can only be considered high-handed.

In her defense, however, she was given a difficult, perhaps impossible task as Trustee. Also, she got little concrete support and assistance from Cynthia and Elizabeth, despite their professed willingness to help her. The Trust was chronically underfunded from the moment of Mary Louise Mikols' death. It is clear that Mary Louise Mikols meant for substantially all of her property, including the funds in the various accounts listed in Schedule A to the Trust, to flow into the Trust in order to fulfill the Trust's purpose, and equally clear that, through no fault of Barbara Martin, this did not happen.

The Counterclaimants' position is that Barbara Martin should have corrected the underfunding problem by demanding, and if necessary, suing for, the return of all funds from the Schedule A accounts, ignores the realities of such a strategy. It is by no means obvious that the beneficiaries would have complied with such a demand, and time and expense of pursuing multiple lawsuits in various jurisdictions would have depleted what funds the Trust had even more quickly. That said, Barbara Martin clearly could have done a much better job in approaching the beneficiaries of the POD and joint account beneficiaries about turning funds over to the Trust. The tentative, half-hearted inquiry she in fact made was doomed to failure

22

because she had not given the beneficiaries enough information about account and Trust terms and finances to be able to make an informed decision.

For Barbara Martin to have distributed the two Trust properties that were subject to subtrusts before payment of expenses would have not have solved the funding shortfall so much as have shifted the problem from the Trust to the subtrusts. Moreover, the only specific immediate distribution actually suggested at the time—Cynthia Harris's suggestion that she be given outright ownership of the Imperial Beach property—would have violated the terms of section 6.01 of the Trust, which clearly requires the Imperial Beach property to be held in trust for the benefit of Mary Louise Mikols's descendants for at least five years after her death.

Still, with the benefit of hindsight, the court does find and conclude that Barbara Martin's best course would have been to use the funds that did come into the Trust from the accounts in Schedule A to pay expenses and to distribute the property as quickly as possible, conditioned on either contributing to any further fund needed to cover expenses or returning the property to the Trust. As the Counterclaimants suggest, she could have conditioned the distribution of the real property on payment of expenses, or conditioned the distribution on an obligation to return it in the case of shortfall—either of which would have been preferable to selling the Imperial Beach property.

On the other hand, the wisdom of these strategies was not necessarily obvious at the time. Article 5 of the Trust explicitly contemplates an administration period "[a]fter my death and before the distribution of trust property as provided in the subsequent Articles of this trust." There can be little doubt that the expenses of both administration and the estate had to be addressed by someone, and Barbara Martin was both personal representative of the estate and Trustee of the Trust. It took months to figure out which of the funds in the Schedule A

23

accounts were in fact coming into the Trust, and much of Barbara Martin's time went into inventorying the widely dispersed personal property of the estate. Her view that the easement issues at the Imperial Beach property should be resolved before the property was distributed was understandable if not justified in hindsight.

The payment of administrative costs, including the hiring of Mr. Lynn, likely would have been incurred at some point whether or not the Imperial Beach property had been distributed or not. Other costs incurred by either the Trust or the estate at this time included, but were not limited to, the funeral costs for Mary Louise Mikols' memorial service; real estate taxes for the various properties; insurance, maintenance, and upkeep for the Blue House and for Imperial Beach; the cost of securing appraisals of the various properties; the cost of inventorying the contents of storage units in different parts of the country; and attorney Smyth's fees, in addition to the actual and anticipated costs associated with the easement problem and the work of attorney Lynn.

## C. Plaintiff's Amended Complaint

Plaintiff Barbara Martin's Amended Complaint essentially seeks instruction and guidance from this court regarding the rights and responsibilities of the parties, and also a claim for costs and attorney fees. The parties appear to agree on the necessity of guidance and instruction, although they plainly disagree as to how the court should respond. In any event, the court is granting judgment on the Amended Complaint as set forth in more detail below. For reasons set forth below, the court is reserving final ruling on Plaintiff's requests for reimbursement of advances made until a further and final accounting is available.

24

D.  The Counterclaim and Plaintiff's Defenses

The five-count Counterclaim asserts a variety of claims against Barbara Martin in her various capacities—Trustee, personal representative and holder of a power of attorney—and seeks various forms of relief.  In response to the Counterclaim, Plaintiff has asserted several defenses that logically should be addressed first because how the defenses are resolved affects how the Counterclaim is resolved.

*Plaintiff's Claim Under the Contest Provision:*  Barbara Martin asserts that the Counterclaimants have through their claims and defenses in this case forfeited any claim under the Trust and pour-over, by virtue of the contest provision at section 13.03 of the Trust.  This issue and the legal framework that governs were discussed in detail in the court's summary judgment ruling.  Nothing in the evidence presented at trial alters the court's view that the Counterclaimants' claims do not implicate the contest provision, and that, to the extent their affirmative defenses may have done so, their assertion of the defenses was justified by the unusual circumstances under which Barbara Martin acted for her mother in executing the pour-over will and Trust documents.

Accordingly, the Court rules in favor of the Counterclaimants on the Plaintiff's assertion that the contest provision divests them of their interests in the Trust and Estate and will proceed to address the Counterclaim on its merits.  Before that, however, another defense raised by Plaintiff needs to be taken up because it affects the legal standard applicable to some of the counterclaims.

*Plaintiff's Defense Under the Limitations on Trustee's Liability Provision:*

At trial Barbara asserted that, under section 11.07 of the Trust, she cannot be held liable for "any error of judgment, mistake of law, or action or inaction of any kind . . . unless [her]

25

decision is shown by clear and convincing evidence to have been made in bad faith." The Counterclaimants contend that this provision is rendered unenforceable by the Trust Code. Section 105(2)(J) of the Trust Code expressly states that "[t]he effect of an exculpatory term under section 1008" may not be altered or amended by a provision of a trust. *See* 18-B M.R.S. § 105(2)(J). Section 1008 of the Code states:

> **1. Exculpation unenforceable.** A term of a trust relieving a trustee of liability for breach of trust is unenforceable to the extent that it:
>
> **A.** Relieves the trustee of liability for breach of trust committed in bad faith or with reckless indifference to the purposes of the trust or the interests of the beneficiaries; …

18-B M.R.S. § 1008(1)(A). Furthermore "exculpatory clauses are not favored by the law and are strictly construed against the benefited party." *In re Trusteeship of Williams*, 591 N.W.2d 743, 747 (Minn. Ct. App. 1999).

The Counterclaimants are correct in suggesting that section 11.07 likely is contrary to the Trust Code in two ways— imposing liability only for acts of bad faith and requiring proof of bad faith by clear and convincing evidence, and, so the court will construe section 11.07 to be consistent with the Code.

*Count I of the Counterclaim:* In Count I the Counterclaimants assert that Barbara Martin is in breach of her duties as trustee and personal representative, and ask for multiple forms of relief, including damages pursuant to 18-A M.R.S. § 5-917; modification of the Trust pursuant to 18-B M.R.S. § 412; removal of Barbara Martin and appointment of a successor, as well as an award of attorney fees and costs.

Based on the entire record, the court does find and conclude that the Defendants have proved a breach by Plaintiff of her duty as Trustee to expeditiously and efficiently settle the

26

estate. *See Estate of Baldwin*, 442 A.2d 529, 536 (Me. 1982).[10]  As soon as it became apparent, as it did within a few months of Mary Louise Mikols's death, that the Trust was drastically underfunded, Barbara Martin as Trustee should have taken steps well beyond what she did to distribute Trust property and limit expenses.  Not all the debts of the Trust needed to be paid before distribution of assets. Under section 5.03 of the Trust as well as under section 816(15) of the Trust Code, payment of these expenses is discretionary, but Trustee Martin could have distributed the real property prior to the payment of all of the obligations of the Trust, subject to receipt and reimbursement agreements to expedite the administration of estate assets.  In fact, that is exactly the approach this court is taking in issuing judgment.

Selling trust property to pay trust expenses should be a last resort, but it seemed to be a first resort here.  The court also finds and concludes the Defendants have proved that a modification of the Trust is appropriate under 18-B M.R.S. § 412, and also that a full updated accounting is appropriate.

On the other hand, the court cannot say, at least at this point, that the Counterclaimants have proved any particular amount of compensatory damages (putting aside their claim for reimbursement of litigation fees and expenses, and also putting aside the question of how expenses should be allocated among the beneficiaries, both of which issues are addressed separately).  Nor have the Counterclaimants proved that Barbara Martin should be removed as Trustee, or that they are entitled to other relief.

Thus, the Counterclaimants will be awarded judgment only in part on Count I.

---

[10] In *Baldwin* the Law Court made the observation that "[s]imultaneously, the executor should have determined as quickly as possible the debts and probable expenses of administration and the taxes, if any, in order to know whether liquid or liquifiable assets of the estate were adequate to discharge those obligations so that sale of the Port Clyde real estate would not be required." *Estate of Baldwin*, 442 A.2d at 534.

27

*Count II of the Counterclaim:* This claim asserts a common law negligence claim, alleging that Barbara Martin was negligent in failing to take steps to assure the Trust was adequately funded, specifically that she failed to alter the joint accounts and POD accounts listed in Schedule A of the Trust, so that the funds therein would flow into the Trust as intended. Thus, this count appears to be based on alleged negligence occurring prior to Mary Louise Mikols's death, at which point it would be too late to change the various accounts in the manner the Counterclaimants claim Barbara Martin should have done.

Any claim of negligence presupposes a duty, and the Counterclaimants have not shown that Barbara Martin had any duty regarding the Schedule A accounts until she became Trustee, which was just three days before Mary Louise Mikols died. Under the power of attorney that Mary Louise Mikols had signed in August, Barbara Martin could have acted on behalf of Mary Louise Mikols in switching the ownership designations on the Schedule A accounts to be solely in Mary Louise Mikols's name. However, holding the power of attorney did not impose a duty on Barbara Martin to switch over any accounts. Had it been shown that Barbara Martin exerted undue influence over Mary Louise Mikols's decision-making and finances, such a duty might arguably have arisen, but the evidence did not point that way.

When she was granted power of attorney in August 2012, Barbara Martin had no reason to believe, that Mary Louise Mikols had less than three months to live. Even in September, Mary Louise Mikols appeared to have rallied from the setback that put her in the hospital. It was only in the last days of Mary Louise Mikols's life that the need to switch accounts became urgent and apparent, and by then it was too late for anyone to do anything about it.

Judgment on Count II of the Counterclaim is awarded to Plaintiff.

28

*Count III of the Counterclaim:* This count alleges various breaches of duty by Barbara Martin as Trustee, specifically with regard to her actions regarding the Imperial Beach property, and alleges that she favored the Blue House and the beneficiaries of the Blue House subtrust over the Imperial Beach property and its named beneficiaries. As noted above, at least in hindsight, it would have been preferable for Barbara Martin to have allowed Cynthia Harris to move into Imperial Beach even during the administration phase.

There is evidence that Barbara Martin felt less personal attachment to the Imperial Beach property than to the Blue House. The Counterclaimants accuse her of violating her duties of fairness and impartiality in allowing her brother Mitchell and some of the grandchildren to use the Blue House, and in funding expenses of the Blue House, at the same time as she was developing plans to sell the Imperial Beach property. Their perception—that she was favoring the Blue House property over the Imperial Beach property because she lives closest to Eagle Lake, Maine, among all the sisters and expected to use it along with her family—is not an irrational one. However, her announced decision to sell the Imperial Beach property was based on her belief that the Trust had no other choice but to sell one of the three real estate properties, and she reasonably concluded that not all three needed to be sold and the Imperial Beach property was the most likely to sell at a price that would cover the Trust's expenses.

Furthermore, instead of selling Imperial Beach, she relented in the face of the Counterclaimants' opposition, and permitted Cynthia Harris to move into the property. She filed a petition for instructions, which is an appropriate step for a trustee faced with an impasse among beneficiaries on how to deal with a drastically underfunded trust. The most valid

criticism of her decisions is that she should have moved more quickly, either to seek instructions or to distribute the Trust property and minimize the expenses.

Defendants have not proved that she should be removed as Trustee, nor have they proved that she is liable to them for compensatory damages (reimbursement of legal fees being a different issue, addressed separately).

Accordingly, judgment on Count III is for the Plaintiff.

*Count IV of the Counterclaim:* Count IV requests that the court declare the Trust to be an uneconomic trust for lack of adequate funds as permitted under 18-B M.R.S. § 414, terminate administration and order the Trust property distributed. The court largely agrees with the Counterclaimants' position, and will grant them judgment on Count IV to the extent of this Decision, and the final judgment that the court anticipates issuing.

*Count V of the Counterclaim:* This count seeks a declaratory judgment to the effect that the Imperial Beach property cannot be sold; that Cynthia Harris has the right to occupy it , and also seeks to have the funds that Barbara Martin received from the accounts listed in Schedule A, as POD beneficiary or joint account holder, be held in trust to defray Trust expenses.

The court will grant declaratory relief to the extent of this Decision and the final judgment that the court anticipates issuing after obtaining updated information as set forth below.

E. Pending Motions

Pending requests for action and motions are addressed as follows:

*Petition for Sale of Real Estate and Assets:* Plaintiff seeks authorization, pursuant to 18-B M.R.S. § 412, to liquidate the three parcels of real estate held by the Trust, and to sell personal property and for other forms of relief. The Petition is granted to the extent of this Decision,

30

which requires the sale of property, but only if the expenses of the Trust are not paid within a reasonable period.

The Petition's request for reimbursement of loans that Plaintiff Barbara Martin and Judith Montoya have made is taken under advisement until after the court receives and reviews a detailed updated list of expenses and also an updated request for reimbursement from Plaintiff and Judith Montoya, and an updated request for reimbursement from the Counterclaimants, with final judgment to issue thereafter as indicated below.

*Counterclaimants' Motion for Imposition of a Surcharge and Award of Attorneys Fees:* This Motion is essentially the mirror image of the Plaintiff's request in her Petition for reimbursement of advances by her and Judith Montoya. Like the Plaintiff's request, the Counterclaimants' request is taken under advisement until after the filing of an updated list of Trust expenses and attorney fee requests.

*Counterclaimants' Motion to Remove Trustee, Discharge Successor Trustees and Appoint a Special Fiduciary:* This Motion seeks to have Trustee Martin and the successor trustees named in the Trust removed and disqualified, and to have a special fiduciary appointed from a list submitted by the parties. This Motion is denied without prejudice, for the following reasons:

- It is the court's intention for the Trust to be wound up in a manner prescribed by the final judgment in this case, as to which the Trustee's discretion is strictly limited.

- The court trusts and expects that Trustee Martin will follow this and future orders of the court.

- Appointment of a special fiduciary would simply add to the expenses of the Trust.

31

Accordingly, the court finds and concludes that removal of Barbara Martin as trustee is unnecessary and unjustified. This Motion may be renewed if cause for doing so emerges hereafter.

F. Further Steps Necessary to Final Judgment

The court's final judgment will look more or less as follows:

- The Imperial Beach and Blue House properties will be distributed to designated trustees to be identified, to be held for the same purposes described in sections 6.01 and 6.03 of the Trust, conditioned on reimbursement by Trust beneficiaries of approved Trust expenses. The Oroville property will be distributed to Barbara Martin, but likewise conditioned on reimbursement in an amount to be determined.

- The court foresees giving Cynthia Harris as trustee full decision-making authority over the Imperial Beach property, and likewise giving Barbara Martin as trustee full decision-making authority over the Blue House, except for the power to sell either property. The Trust provides for sale of each property, but only on certain terms, and the final judgment likely will maintain those terms.

- In deciding the amounts of reimbursement that will be required as a condition of distribution of the real estate, the court will take into consideration, not only the expenses of the Trust that need to be covered, but also the justification for those expenses in terms of benefit to the Trust.[11] Thus, the Trustee's accounting should be very specific in terms of how the funds that came into the Trust were applied to expenses, and also how any advances or loans were applied to expenses of the Trust

---

11 The question of what Trust expenses can fairly be assessed to Judith Montoya, given that the Albert Street house passed by operation of the deed rather than through the estate and the Trust, is also one on which the court invites the parties' recommendations. The question of what reimbursement she is entitled to receive for loans or advances to the Trust is a different issue.

32

other than the attorney fees and costs of this litigation, which the court considers a separate category of expense.

- The personal property will be sold by the Trustee and the proceeds used to defray Trust expenses.

- The final judgment will also address the various claims for reimbursement of attorney fees and costs incurred in this litigation, but some comment now on that topic is appropriate. This case began, and should have remained, as a straightforward request for the court's guidance, given the impasse about how to deal with the underfunding of the Trust. Plaintiff did propose to sell the Imperial Beach property, but instead of actually doing so, she sought guidance from the court. The Counterclaimants injected inflammatory issues into the case—issues on which they will not prevail—through their Counterclaim. On the other hand, the Plaintiff responded in kind by taking the equally inflammatory position that the Counterclaimants had forfeited all entitlement under the Trust, and also it was her failure to consider measures short of the extreme remedy of selling a major Trust asset that provoked the impasse in the first place. In other words, the responsibility for this regrettable dispute over money and property that has divided a family is widely shared, and the ultimate allocation of litigation expenses will reflect that.

G. Schedule for Further Filings and Proceedings

This Decision does not constitute a final, appealable judgment, because further steps are needed to enable the court to render judgment on all issues, specifically to define the conditions for distribution of property. The Clerk will schedule a telephonic conference of counsel, after which the court will issue an order setting a schedule for the rest of the case.

33

Pursuant to M.R. Civ. P. 79(a), the clerk is directed to incorporate this Decision into the docket by reference.

Dated _Sept 22, 2015_

_____
A. M. Horton, Justice

Entered on the Docket: **9-23-15**
Copies sent via Mail ___ Electronically ✔

34

Barbara T. Martin, Trustee of the Mary Louise Mikols Living Trust U/T/D October 12, 2012 v. Cynthia C Harris, Elizabeth H. Mikols, Julia A. Harris, and April F. Parras, et al.
BCD-CV-14-07


Barbara T. Martin, Trustee of the Mary Louise Mikols Living Trust U/T/D October 12, 2012
    Plaintiff / Counterclaim Defendant

        Counsel:                William Devoe, Esq.
                                80 Exchange Street
                                P.O. Box 1210
                                Bangor, ME 0442-1210


Cynthia C Harris, Elizabeth H. Mikols, Julia A. Harris, and April F. Parras, et al.
    Defendant / Counterclaim Plaintiffs

        Counsel:                Christian Chandler, Esq.
                                One Canal Plaza Suite 1000
                                PO Box 7320
                                Portland, ME 041112-7320